James E. SWANN et al., Plaintiffs,

v.

**CHARLOTTE–MECKLENBURG BOARD OF EDUCATION et al., Defendants.**

**Civ. A. No. 1974.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 29, 1971.

Julius L. Chambers, and Adam Stein, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiffs.

William J. Waggoner, Charlotte, N. C., for defendants.

## ORDER

McMILLAN, District Judge.

The Charlotte-Mecklenburg schools are now being operated pursuant to a decision of the Supreme Court of the United States in Swann, et al. v. Charlotte-Mecklenburg Board of Education, et al., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), which affirmed previous orders of this court respecting desegregation of the schools.

On June 17, 1971, the defendants submitted incomplete proposals for the adoption of a different plan of pupil assignment for the next school year. Those proposals were made the subject of a hearing on June 17 and 18, 1971, but were withdrawn by the defendants during the hearing. The nature of those proposals was outlined in a memorandum filed by this court on June 22, 1971, copy of which is attached to and made a part of this order. In substance, although those proposals would have achieved a "racial balance" they were discriminatory in detail and in overall result; they placed increased burdens upon black patrons while partially relieving white patrons of similar burdens; and they were reasonably susceptible of the interpretation that they were the first long step in the liquidation of the inner-city "black" schools.

The defendants have now presented a revised version of their proposals which they call the "revised feeder plan," and conferences and a hearing have been conducted concerning this revised plan.

In large measure the revision eliminates the most flagrant constitutional objections to the original "feeder plan." It would assign additional students to West Charlotte so that it would operate at approximately its capacity of 1,603 students; it would retain Northwest as a junior high school; it would maintain the 4/2 grade structure in place of the proposed 5/1 grade structure for seven of the nine black elementary schools in question; and it would operate those schools with student populations more nearly approximating their capacities.

However, under the new proposals Villa Heights and University Park would be operated at just above half-capacity as one-grade schools for grade six only;

and Double Oaks Elementary School would be closed.

As to Villa Heights and University Park, the only reason advanced for wanting to keep them reduced to one-grade schools at part capacity is that the use of those schools for both grades five and six would overcrowd them.

Staff work has already been done for the operation of Villa Heights and University Park on a 4/2 basis. When University Park was 100% black in 1969–70 it had 825 students and a capacity of 882. The staff analysis would assign 870 fifth and sixth grade students to University Park. When Villa Heights was 91% black in 1969–70 it had 1,017 students. The staff analysis would assign 840 fifth and sixth grade students to Villa Heights. The shift from 5/1 back to 4/2 grade structure will in fact reduce the overcrowding in the system and make more efficient use of classroom space. Overcrowding, then, does not seem to be a valid objection to the full use of those facilities. No non-racial educational reason was advanced for reducing the enrollment of either school.

The closing of Double Oaks is not a new subject. In evidence presented in the summer of 1970 some witnesses recommended that it be closed because, like some other "black" schools, it is located in a *cul de sac* with only one vehicle entrance. No serious objection was raised to its closing as a part of a non-discriminatory desegregation plan. In fact, the August 3, 1970 order included a provision that

> "*If the board elect to carry out the Finger plan* they are authorized, if they find it advisable, to close Double Oaks School and reassign its pupils in accordance with the general purposes of the February 5, 1970 order."

The situation has changed. The board did not close and does not ask to close Double Oaks under the Finger plan. The contention as to its inaccessibility is now found to be untenable; the defendants own a second right of way into the school from North Graham Street, less than two blocks away, which, though rough, is already passable by automobile; and it would appear to take only the grading and surfacing or gravelling of that short road to add a second entrance or exit for the school.

 The suggestion was made, without supporting data, that the percentage of white students attending Double Oaks was lower than those who were assigned to the school. However, the statistical evidence presented under date of June 16, 1971 (Defendants' Hearing Exhibit 7) indicates that the percentage of white students actually attending this school in the seventh month of the 1970–71 school year was only two per cent less than the percentage of white students who had been *assigned* to the school in September, and was one per cent *greater* than the proportion called for under the plan. Moreover, "white flight" is still not acceptable as a reason to shrink from constitutional obligation. There was no testimony as to any educational deficiency in the school itself nor in its administration, and the record is devoid of testimony by any parent, student, principal or teacher covering any of the educational considerations bearing on its proposed closing. The court does not find any non-racial educational justification for closing Double Oaks.

To close the school now without educational reasons to support it would appear to continue the discriminatory thrust of the original "feeder plan," as described in the attached memorandum of June 22, 1971.

Although the staff work on pupil assignment to operate Double Oaks has not been done and would require some work and rearrangement of existing assignments, it would not appear to be intrinsically more difficult than similar staff work for the assignment of students to a new school, if one were con-

structed, or for the reopening of any of the other schools which are presently being unused.

Even with Double Oaks reopened and Villa Heights and University Park operating at full capacity, the "feeder plan" is noticeably discriminatory because it will require most inner-city black children to ride school busses to distant schools approximately ten out of their twelve school years, while appearing to place few white students under any comparable burden. The court is not prepared, however, on the present record at least, to find that this discrimination in method is unconstitutional; it may be the only practicable present way to deal with the problem.

█ The plaintiffs have suggested that the plan is also discriminatory in that it relieves the children in several well-to-do neighborhoods (Sharon, Beverly Woods, Olde Providence, Montclaire and Selwyn, for example) of their fifth and sixth grade assignments to inner-city schools, and sets them up for attendance at "neighborhood schools" for most or all of their entire school careers, while it assigns lower-income white children from nearby areas to student duty at the "black" schools. This may be a type of class discrimination which courts some day may undertake to consider as a constitutional question. It is more likely to be a practical problem which the school board will eventually solve under the political realities of school administration, including the fact that probably these neighborhoods will become involved in some two-way exchange of students with neighborhoods surrounding such new schools as may eventually be built or re-opened. In any event, except as it may constitute part of a general plan to relieve white students of bussing wherever possible and to bus black students when the choice is available, the creation of such white "protectorates" does not at present appear to call for disapproval of the plan.

ORDER

1. Except as expressly modified herein, the defendants shall continue operating the schools in accordance with all previous orders of court, and attention is specially called to the orders of February 5, 1970, August 3, 1970, the memorandum of October 5, 1970, and the opinion of the Supreme Court of the United States, above cited.

2. As a part of compliance with that order the defendants may, if they wish, use their proposed amended "feeder plan" provided it is modified in a *nondiscriminatory* way so as to continue operation of Double Oaks School for grades five and six with enrollment reasonably approximating its capacity, and so as to continue operating Villa Heights and University Park as schools for both fifth and sixth grade students and with enrollments reasonably approximating their pupil capacity, generally as outlined in the staff study.

3. If the above changes in the "feeder plan" are not acceptable to the board they are directed to continue operating the schools under the existing orders of court but to take nondiscriminatory steps to remedy the situations which were allowed to develop, mostly in westside schools, under which schools became predominantly black.

█ 4. The defendants are enjoined and restrained from operating any school for any portion of a school year with a predominantly black student body. The movement of children from one place to another within the community and the movement of children into the community are not within the control of the school board. The *assignment* of those children to particular schools *is* within the total control of the school board. The defendants are therefore restrained from assigning a child to a school or allowing a child to go to a

school other than the one he was attending at the start of the school year, if the cumulative result of such assignment in any given period tends substantially to restore or to increase the degree of segregation in either the transferor or the transferee school.

5. The conditional approval of the "feeder plan" of pupil assignment does not relieve any of the defendants of the duty to operate the schools according to the orders of court which have previously been entered. The plans are simply illustrations of means to accomplish the constitutional result, which is the non-discriminatory operation of the schools on a desegregated basis.

6. The defendants are directed to supply the court on or before September 15, 1971 with reports showing the number of children of each grade and race attending each school in the system, the numbers of children who were assigned to each school, the capacity of each school, the number of mobile units then in use at each school, and the number of children, by race and grade, being transported to each school. The defendants are also directed, until further notice, to supply similar reports on or before the 15th day of each month thereafter.

MEMORANDUM OF JUNE 22, 1971.

On June 17 and 18, 1971, a hearing was held on current partly-formed proposals of the defendants for revision of the court order approved by the Supreme Court in Swann, et al., v. Charlotte-Mecklenburg Board of Education, et al., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), requiring desegregation of the Charlotte-Mecklenburg schools.

The proposals were not accompanied by any formal resolution of the school board and are in the form of oral testimony illustrated by statistical charts and maps. Details of locations of lines between attendance zones and assignment of particular pupils have not been finally decided.

The plan, like the court order now in effect, provides that all schools will be predominantly white. This element, one of those necessary in the desegregation of these schools, inclined the court toward approval of the plan if the plan were otherwise lawful.

■ However, when the plan is studied in depth and its purposes and results emerge through its statistics, it becomes apparent that it seeks to raise issues which were decided two years ago; that it is regressive and unstable in nature and results; that it would retreat from approved arrangements and put the burdens of desegregation primarily upon the black race; that it would unlawfully discriminate against black children; that its methods are discriminatory; and that it should not be approved.

The board's proposals, according to the testimony, would include the following:

1. Close two "black" schools—Double Oaks Elementary and Northwest Junior High Schools, which have a combined capacity of more than 1,620 pupils.

2. Reduce West Charlotte High School, formerly "black" with pupil capacity of 1,603, to an assigned student body of 940, leaving at least 663 empty classroom seats. By contrast, other high schools are heavily loaded; Myers Park, for example, with a capacity of 1,676, would be assigned 2,330 students.

3. De-populate fifteen other "black" or predominantly "black" elementary schools from their current capacity of 8,694 pupils to an assigned student population of 4,645, thus leaving 47% of their classroom seats empty.

4. Convert nine of those fifteen elementary schools (Bruns Avenue; Amay James; University Park; Druid Hills; Oaklawn; Villa Heights; Marie Davis; First Ward and Lincoln Heights) from schools serving grades five and six to

schools serving grade six only. These nine schools would be reduced in total student population to 2,755 students, which is a little over 51% of their 1970–71 population of 5,362 students.

5. The black elementary students thus assigned out of the closed and partly closed schools would be transported in a one-way bussing or "satellite" program to outlying "white" schools.

6. The only "cross-bussing" proposed for white elementary students would appear to be the white sixth graders who might be assigned to the one-grade inner-city schools.

7. Unused classroom spaces in the closed and partly closed schools above described by count would be 6,342.

8. In addition, there will continue to be approximately 2,000 vacant classroom spaces in the buildings formerly occupied by Myers Street Elementary, Second Ward High and Irwin Avenue (old Harding High) Schools.

9. Space for the black children thus transferred from these 8,000 or so inner-city classroom spaces would be provided in outlying white schools, many of which would be severely overcrowded, as shown by the following illustrative table:

| | Capacity | Assigned | Excess Over Capacity |
|---|---|---|---|
| Sharon | 486 | 675 | 189 |
| Carmel Junior High | 606 | 1,050 | 444 |
| South High | 1,530 | 2,075 | 545 |
| Montclaire | 648 | 900 | 252 |
| Paw Creek Annex | 270 | 425 | 155 |
| Hidden Valley | 648 | 1,100 | 452 |
| Garinger High | 1,870 | 2,430 | 560 |
| Myers Park High | 1,676 | 2,330 | 654 |
| Totals: | 7,734 | 10,985 | 3,251 |

10. Shutting down the two schools and reducing the population of the others would require bussing 2,491 (estimated) extra students, plus those already needed to be bussed to correct the West Boulevard over-crowding.

11. Distances of travel required of many elementary children would be sharply increased—for example, first graders from Double Oaks community in northwest Charlotte would be assigned to Bain School near the east edge of the county, a distance of twelve or more air line miles.

12. No reason except "white flight" was advanced to support the creation of that unusual organization, the school for sixth graders only.

13. Nothing is revealed about plans for the future, but based on past experience it may be reasonable to wonder if a move to close additional "black" schools might be in the offing for next year.

14. Space is proposed to be provided at the overcrowded schools by purchasing 172 new mobile classroom units for 25 children each. These are not on hand; the delivery schedule for such units a year ago when the board bought a group of 10 such units was ten weeks after the decision to buy was made. It is now less than ten weeks until the opening day of school.

15. The cost to taxpayers of this program, which would restore discrimination rather than promote constitutional rights, is many millions of dollars. The last batch of schools that were closed in 1969 (Second Ward High and several other schools) were valued by the board at that time at more than $3,000,000. Exclusive of library books, evidence in the record shows property value of Northwest Junior High is $723,647.65; of Double Oaks, $883,626.65; of West Charlotte High, proposed to be used at less than 60% capacity, $2,980,209.23; the value of thirteen of the fifteen elementary schools which are to be de-populated to a little more than one-half of their capacity is $6,349,679.53. If Bruns Avenue and First Ward, the other two schools, both relatively new, are as valuable as their older counterparts of similar size, this adds another $1,800,000 to the figure.

16. The minimum cost of the 172 mobile units, assuming they can be had and assuming that the price has not gone up in the past year, is $8,300 each, or $1,427,600, *exclusive* of seats and other classroom equipment.

17. Cost to the taxpayers, even in terms like these, is not for the courts to control; but the fact that it is proposed to spend money and abandon property in such wholesale fashion to *preserve* discrimination is in stark contrast to the previous reluctance of the board to spend money to *eliminate* discrimination.

18. Apart from other considerations, the purchase and location of 172 mobile units for 25 students each is a sizeable program of school location and construction of facilities for at least 4,300 students, and under the Supreme Court decision in *Swann*, district courts are required to review such programs and not to approve of them if they are discriminatory in result.

In the order of August 15, 1969, D. C., 306 F.Supp. 1291, approving as a one-shot temporary proposition the one-way transport of consenting black children from closed inner-city schools, the court said:

"It is not the intention of this court to endorse or approve any future plan which puts the burden of desegregation primarily upon one race."

\* \* \* \* \* \*

"\* \* \* One-way bussing plans for the years after 1969–70 will not be acceptable."

"Certainly, if the means selected by the District to accomplish its purported purpose themselves involve substantial elements of racial discrimination, its entire plan becomes suspect concerning whether it is really a good faith reasonably adequate implementation of these principles." Brice v. Landis, 314 F.Supp. 974 (N.D.Calif., 1969).

■ The closing of a black school and the transfer of its pupils to a school without adequate facilities to receive them in the absence of valid educational reasons and without any similar burden upon white students or teachers has been held "inherently discriminatory and therefore invalid." Smith v. St. Tammany Parish School Board, 302 F.Supp. 106 (E.D.La., 1969).

Where black schools are closed and the principal burden of transportation placed upon black students,

"\* \* \* there is a heavy burden on the school board \* \* \* to explain the closing of facilities formerly used for the instruction of black students." Haney v. County Bd. of Ed. of Sevier County, 429 F.2d 364, 372 (8th Cir., 1970).

As late as June 10, 1971, the Fourth Circuit Court of Appeals affirmed an order entered by Judge Ted Dalton in Roanoke, Virginia, disapproving the closing of a black high school without adequate educational reason and transporting its pupils to an overcrowded "white" school. Adams v. School District Number 5 (Green v. School Board of Roanoke), 444 F.2d 99 (4th Cir., June 10, 1971).

■ "White flight" was advanced as the chief reason for the board's proposals. The facts advanced will not support a finding that "white flight" is a serious threat to the public schools of Mecklenburg. The same cry has been raised before, here and elsewhere; and [with all due deference to the right of people to send their children to the best schools they can afford] the answer must be what it has always been: Public displeasure is no excuse for unconstitutional discrimination. As the Supreme Court said in Monroe v. Board of Commissioners, 391 U.S. 450 at 459, 88 S.Ct. 1700 at 1705, 20 L.Ed.2d 733 (1968):

"We are frankly told in the Brief that without the transfer option it is apprehended that white students will flee the system altogether. 'But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement· with them.' Brown II [Brown v. Board of Educa-

tion], 349 U.S. [294] at 300, 75 S.Ct. [753] at 756 [99 L.Ed. 1083]."

## CONCLUSION

In apparent recognition of the considerations outlined above, the defendants during the hearing withdrew their original proposals, and are now preparing for consideration a revised version of their proposals. The court has also requested defendants to prepare and submit for comparison a revision of the plan already in effect, adjusted to correct the deficiencies, mostly involving west side areas, which were referred to in the order of October 5, 1970.