**James E. SWANN et al., Plaintiffs,**

v.

**CHARLOTTE–MECKLENBURG BOARD OF EDUCATION et al., Defendants.**

**Civ. A. No. 1974.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Oct. 21, 1971.

---

Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiffs.

William J. Waggoner, Charlotte, N. C., for defendants.

Ray Rankin, Charlotte, N. C., for intervenors.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

Subsequent to the decision of the Supreme Court in Swann, et al., v. Charlotte Mecklenburg Board of Education, et al., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (April 20, 1971), the defendants requested this court to authorize them to abandon the Finger plan which the Supreme Court had just approved, and to substitute in its place for 1971–72 a new pupil assignment plan called a "feeder plan." The original feeder plan, the characteristics of which were described in this court's memorandum of June 22, 1971, was proposed and then withdrawn by the defendants at a hearing on June 17, 1971; and a revised feeder plan was submitted on June 25, 1971.

In an order of June 29, 1971, 328 F. Supp. 1346, the defendants were directed to continue to operate the schools in accordance with the orders of this court and the Supreme Court judgment approving those orders. As to pupil assignment, the board was given the option, subject to previous orders, of putting the revised feeder plan into effect (with Double Oaks re-opened and with Double Oaks, Villa Heights and University Park elementary schools assigned numbers of pupils reasonably approximating their

pupil capacities) if they wished, or, in the alternative, to continue to operate the schools in compliance with the previously approved Finger plan.

The school board decided to abandon the Finger plan and to adopt the feeder plan with the specified modifications. They also appealed the June 29, 1971 order to the Fourth Circuit Court of Appeals.

On August 25, 1971, Mark S. Smith and others, parents of white children living generally north and west of Charlotte and generally in the vicinity of the black quarter of Charlotte, filed a petition to intervene and were allowed to intervene. They asserted in their complaint that the feeder plan was discriminatory because north and westside white children would have to go to schools outside their "traditional neighborhood" (that is, to formerly black schools) an average of six or seven years out of twelve, whereas children in the white communities of southeast Mecklenburg would be required to go to schools outside their "traditional neighborhood" (that is, to formerly black schools) for only a year or two.

On August 27, 1971, the original plaintiffs filed a "Motion for Further Relief," alleging that the board was not following its own proposed feeder plan; that it had made numerous changes in the plan after it was approved; that it had allowed and was allowing transfers and enrollments in violation of court orders; and that the effect of the board's actions was or would be to restore segregation in some of the schools.

The court directed the defendants to supply information on the basis of which the contentions of the plaintiffs and of the intervenors, and the responses of the defendants, might be considered.

Schools opened September 7, 1971, and have reached attendance of 94% to 95% of enrollment, which is better than the 92% to 93% average attendance for previous years.

On September 22, 1971, a hearing was conducted and additional evidence was taken. Essential facts and conclusions follow.

### THE INTERVENORS

As a group the intervenors are white parents of children who under the feeder plan will be assigned for six or more years to attend Northwest Junior High, West Charlotte High, and other schools which before 1970 were 100% black, or nearly so. The white students from the southeast who, under the Finger plan, attended formerly black schools, have for the most part under the feeder plan been assigned for 1971–72 to schools nearer home.

It is apparent that the feeder plan puts increased burdens of transportation upon black children and upon children in certain low- and middle-income white communities; that it relieves the vast majority of students of the wealthier precincts in southeast Mecklenburg from any assignment or transportation to formerly black schools; and that, compared to these wealthier white people in southeast Mecklenburg, many more of the children of the intervenors are going to formerly black schools.

On the other hand, the southeast schools, under the feeder plan, had black students attending them on September 15, 1971 in proportions varying from 10% at Matthews to 41% at Myers Park Elementary; some of the southeast white fifth and sixth graders do attend Bruns Avenue and First Ward (two new, formerly "black" elementary schools); the intervenors, with an average of six or seven years "on the road" are far and away better situated than the black children, who as a group face assignments outside their "traditional neighborhood" for an average of about ten out of their twelve years in public schools.

Moreover, the formerly black schools are not shown nor suggested to be inferior in faculty, plant, equipment or program; and if white majorities are maintained in them, it is within the realm of reason to hope that white adults will quit thinking of them as undesirable. West Charlotte, for example, has

a property value (mostly in the form of modern buildings) of more than three million dollars.

■ The evidence no doubt shows economic and class discrimination; several dissenting school board members voted once to correct the matters complained of by the intervenors; it may be that the board will, in time, correct this discrimination. Absolute equality in apportioning the burdens of attaining desegregation in compliance with the Constitution is impossible to achieve. As far as present corrective orders by the court are concerned, the views expressed in the June 29, 1971 order when these questions were first raised still appear to be appropriate. On this record, for now at least, court intervention does not appear to be indicated.

### THE FEEDER PLAN AND PROBLEMS OF RE-SEGREGATION

The new plan is called a "feeder plan" because each high school draws its pupils from attendance areas of designated junior high schools which, in turn, draw their pupils from attendance areas of designated elementary schools; groups of elementary schools "feed" designated junior highs and the junior highs "feed" designated senior highs.

Educational reasons (in addition to considerations of administrative convenience) advanced for the plan are that it tends to keep children together for their entire school career and promotes the development of group and school spirit and stability and cushions shocks of transfer from one school to another.

These educational arguments for the feeder plan may be subject to question. For example, not all would agree that it is desirable to confine a child's probable school contacts to a particular designated group of students, or to students from particular areas, for twelve years; there is some thought that diversity of acquaintance and exposure enhances education. It was not necessary to change school assignments in order to have most of the effects of a feeder system; children assigned under last year's plan to a particular elementary school could have been "fed" to a particular junior high school and then to a particular senior high school, regardless of whether they got into the elementary school or the junior high school under a feeder plan, the Finger plan, a "satellite program," or some other plan; the Finger plan itself was in fact a type of feeder plan. Finally, the mobility of American life is such that no plan of assignment based on geographic zoning is really likely to deliver most of the children to the three schools predicted over a period of twelve years. Census reports show that approximately one-fifth of Americans move from one residence to another every year. If Mecklenburgers are as mobile as Americans generally, the average family will move about two times while a child is going through twelve grades. Many if not most of these moves will be to other school attendance zones. Prior evidence in the record shows that in Charlotte-Mecklenburg schools 500 to 600 students a month transfer their residence during the school year from one school zone to another—aside from those who move during the summertime. The suggested benefits of a "feeder" system may therefore be largely unattainable.

As pointed out on June 22, 1971, the feeder plan is unnecessarily expensive because with over 6,400 empty classroom spaces in the schools now open (plus the space available at Second Ward and Irwin Avenue) it contemplates the use of many mobile classroom units. The reduced number of old and new mobile units now proposed (232) is enough to house between 5,800 and 6,960 students; this is a massive program of school building and location which the court is required under the decisions to scrutinize for its possible effects upon the racial make-up of the schools.

The plan is also expensive because, according to the evidence, although the total school enrollment is less this fall, the number of students riding public school busses and City Coach Lines has increased by 7,587 students—from 39,-080 under the Finger plan in March of

1971 to 46,667 under the feeder plan in October, 1971.

The use of a feeder plan; the particular pupil assignments; increased bussing; economy of tax money; these are educational and financial matters normally for decision and action by the elected board. The court welcomes the situation in which, for the first time, in all details, the pupil assignments are entirely the work of the local board rather than being, even in theory, the work of court appointed consultants.

Nevertheless, if the feeder system, the revised pupil assignments, or the mobile classroom program causes or restores racial segregation, the Constitution requires appropriate corrective action. If unlawful segregation exists, it is not justified by the existence of educational reasons for acts which produce it.

The essential reason why segregation in public schools is unconstitutional is itself in fact an educational reason—segregated education is inferior education and therefore unequal and discriminatory against the black children.

The principal question now raised about the feeder plan is not the present pupil distribution *per se;* no school is predominantly black, and as of September 15, 1971, the black student populations varied from 10% black at Matthews to 48% black at West Charlotte High. Rather, the principal question is whether the schools will or can remain desegregated under present conditions—whether the plan is likely to be reasonably stable in practice. Historically, schools in this system which have exceeded 50% black have tended to become completely black, and, without court intervention have been allowed to go "all the way." If the plan shows no promise of keeping the schools reasonably stable, the adoption of the plan may as to the formerly black schools be only an exercise in statistics and map-making. If it does show promise of keeping the schools reasonably stable, then we may be approaching the day when unconstitutional discrimination will be ended and the case can be terminated.

The defendants since February 5, 1970, have been subject to orders of this court which, as amended on August 3, 1970, read as follows:

\* \* \* \* \* \*

"5. That no school be operated with an all-black or predominantly black student body.

\* \* \* \* \* \*

"9. That the defendants maintain a continuing control over the race of children in each school, just as was done for many decades before Brown v. Board of Education, and maintain the racial make-up of each school (including any new and any re-opened schools) to prevent any school from becoming racially identifiable.

"10. That 'freedom of choice' or 'freedom of transfer' may not be allowed by the Board if the [cumulative] effect of any given transfer or group of transfers is to increase [substantially] the degree of segregation in the school from which the transfer is requested or in the school to which the transfer is desired.

"11. That the Board retain its statutory power and duty to make assignments of pupils for administrative reasons, with or without requests from parents. Administrative transfers shall not be made if the [cumulative] result of such transfers is to restore or increase [substantially] the degree of segregation in either the transferor or the transferee school.

"12. That if transfers are sought on grounds of 'hardship,' race will not be a valid basis upon which to demonstrate 'hardship.'

"13. That the Board adopt and implement a continuing program, computerized or otherwise, of assigning pupils and teachers during the school year as well as at the start of each year for the conscious purpose of maintaining each school and each faculty in a condition of desegregation."

The local, state and federal forces which created segregated schools and

which were described in this court's opinions of April 23, and November 7, 1969, and February 5, 1970, have not been shown to have vanished but are in large measure (except for statutes and ordinances which were repealed because they were racially discriminatory on their face) still alive. Residential housing in Charlotte, because of those forces, is still almost totally segregated except in neighborhoods that are shifting from white to black. Reliance on geographic zones for pupil assignments in this context can only lead toward re-segregation in many schools unless the defendants act to prevent it.

In 1969, the school board proposed a partial desegregation plan which, as described by the board, would have transferred about 4,200 children from black schools to white schools. It looked good on paper and was approved by an order of August 15, 1969. See 306 F.Supp. 1291, 1296, 1298. By November, however, it was apparent that the plan had not been carried out according to its advance description and that instead of transferring more than 4,000 black students to formerly white schools it only transferred 1,315; and those 1,315 were, for the most part, put in schools which were about to become predominantly black. See 306 F.Supp. 1302. In the fall of 1970, the defendants put into effect the Finger plan for pupil assignment (the outline of which was devised by a court consultant but the details of which were drafted by the school staff). In the face of the specific court orders which are quoted above, the schools were opened and operated with Berryhill and Barringer, two formerly white schools, predominantly black, and with Amay James still predominantly black. This situation is described in the court's memorandum of October 5, 1970, copy of which is appended hereto. Three other schools, Enderly Park, Hoskins and Wilmore, were allowed to reach or pass the 50% mark during the year.

In addition, several highly specific official actions of the school board itself since the April, 1971 decision of the Supreme Court have added new official pressures which tend to restore segregation in certain schools. These are the construction program (use and location of mobile units); the under-population and proposed closing of formerly black schools; and several recent decisions about pupil assignments and transfers. The current plan contemplates use of 232 mobile units. These units, in the main, are located or scheduled for location at suburban schools remote from the black community. Simultaneously, the formerly black schools, with few exceptions, are being operated at considerably less than capacity. The assignment of mostly low- and middle-income white children to formerly black schools, and the removal of wealthier whites, of which the intervenors complain, is a major element of such recent board action. Another is a series of recent decisions by the board which have allowed numbers of white children to abandon and black students to return to formerly black schools, in violation of existing court orders.

With that history in view, it is necessary to inquire into the board's present plan or program for dealing with foreseeable problems of re-segregation in response to the pressures which have been mentioned in this order. If the board has a program or policy to deal with the results of these pressures, the schools can nevertheless be operated in compliance with the law. If it has no plan, many of the schools are likely to re-segregate.

There is no such plan and no such program.

According to the evidence, the board and school staff assume that various formerly black schools and other schools will turn black under the feeder plan. In the face of that assumption, the board formally voted *not* to adopt a resolution to restrict pupil transfers which would adversely affect the racial make-up of any school. They have made and allowed transfers which, coupled with changes of residence, have increased the proportions of black pupils at West Charlotte from the 23% proposed in June to 48% on September 15; similar though lesser

changes have been allowed in other schools. There is, according to the evidence, no board policy even to consider race in pupil transfers unless a particular transfer or enrollment will result in making a school more than 50% black. (What they would do even in that event is not clear.) There is no policy to restrict transfers which have the cumulative effect of substantially increasing segregation; no policy to learn what children move from one attendance zone to another during the summer, and to take these inevitable changes of residence into account in planning fall pupil assignments; no central method of keeping track of changes of residence during the school year; and no policy to check on "changes of residence" to determine whether such changes are *bona fide* or not. There is also no admitted *practice* of doing any of these things to comply with the orders of court (although it might be inferred from the current statistics that, without admitting to a policy, the staff are being allowed or expected in fact to keep all schools less than 50% black).

It is also apparent that the defendants have misinterpreted the court orders quoted above when they assume that a pupil assignment or transfer will not, within the meaning of the order, "substantially" increase segregation unless the transfer will leave one of the affected schools over 50% black. This interpretation was not revealed to the court until the hearing on September 22, 1971.

The word "substantially" was put into the order to allow the board leeway for use of discretion and common sense, but not to authorize abandonment of control until a school has already become predominantly black.

Racial discrimination through official action has not ended in this school system.

Racial discrimination through official action has not ended when a school board knowingly adopts a plan likely to cause a return to segregated schools and then refuses to guard against such re-segregation.

It is therefore apparent that although the current plan *as now working* should be approved, the case will have to be kept active for a while longer.

## ORDER

The further relief sought by plaintiffs and by the intervenors is denied, and operation of the schools for 1971–72 under the revised feeder pupil assignment plan as now working is approved, upon condition that defendants henceforth comply with the previous orders of court, particularly including those orders which are quoted herein, as interpreted herein. Unfortunately, whether by design or otherwise, official discrimination is still going on. Defendants are expressly directed not again to put upon any order an interpretation which causes or tends toward segregation or re-segregation. Jurisdiction, for the present, is retained. The Clerk is directed to deliver copies of this order by certified mail to all school board members, individually, and to the Superintendent of Public Instruction.

## APPENDIX

### MEMORANDUM OF Oct. 5, 1970.

On September 23, 1970, and October 2, 1970, attorneys for the School Board filed documents each described as an "Interim Report on Desegregation." The September 23 report shows that the schools are open with pupil attendance of 93.6% of actual enrollment and 91.6% of anticipated enrollment. These figures compare with the average previous year-round attendance of approximately 93% of actual enrollment. The Board, the administrative staff, the teachers, the parents and the children involved deserve much credit for the quiet and orderly way in which the schools have opened.

However, under existing pupil assignments Barringer (56.5%) and Amay James (83.9%) remain predominantly black, and Berryhill has been converted by current assignments from predominantly white to predominantly (64.5%) black. Several schools (Enderly Park, 47.7%, Tryon Hills, 45.7%, and Wilmore, 48.8%) may become predominantly black

unless assignments are made to prevent it, while Spaugh Junior High (40.1%) will become predominantly black if the junior high children who are expected to move into Little Rock Homes, a new low-cost housing project, are assigned to Spaugh.

The administrative staff have recommended to the Board several ways to modify assignments to Barringer, Berryhill and Amay James to change their presently black characteristics and to modify assignments involving Spaugh to reduce the likelihood that Spaugh will become a predominantly black school. [The October 2 report shows that the staff have also proposed ways to relieve the overcrowding at Berryhill by importing nine mobile classrooms and nine teachers.]

The School Board has taken no action on the staff recommendations.

The plaintiffs on September 28, 1970, filed a "Response" to the September 23 report, requesting that the court direct complete staff studies of the various problems and staff recommendations for their solution.

With the argument of the appeal in the Supreme Court so close at hand this court would prefer to make no new orders until the appeal is decided.

However, if the February 5, 1970 order is upheld on appeal, steps will have to be taken later in the school year to correct the situations described. Moreover, counsel for the School Board has now requested the court for comment or ruling on the problems described in the reports. The school year has just begun; eight schools out of one hundred and seven are still on part-time schedules; if changes are to be made they can be made now better than later. The court has therefore reviewed the information in the reports to determine whether it indicates compliance with previous court orders.

The principal new elements introduced into pupil assignment by the Finger plan were the pairing of some schools and the cross-bussing of children. None of the three predominantly black schools mentioned were involved in pairing and cross-bussing. With respect to Barringer and Berryhill, the Finger plan and the Board's own plan are both based upon the Board's 1969 population figures and upon the Board's own "computer zones," with identical pupil populations and identical percentages of black children. Barringer, Berryhill and Amay James are now predominantly black because in making pupil assignments for the fall term the defendants did not make allowances for the 1,500 westside, low-cost, principally black housing units (Dalton Village, Boulevard Homes, Little Rock Homes and some large private developments) which are currently being completed or occupied.

The populations of the school *"zones"* have changed because of the movement of people. The populations of the *schools* have become predominantly black because of *assignment policies* of the School Board. There has been a change in location, for part of the problem, such as from Biddleville to Berryhill, but the situation presents the same issue which has been before the court since the 1969 hearings.

The racial make-up of the predominantly black schools could and should have been foreseen and proper assignments could and should have been made by the School Board. Fifteen hundred low-cost dwelling units, most of which adjoin the main highway between downtown Charlotte and the Charlotte airport, were not built in a day.

Previous district court orders include the following:

*December 1, 1969, page 8, ¶15:* "On the facts in this record and with this background of *de jure* segregation extending full fifteen years since *Brown I,* this court is of the opinion that all the black and predominantly black schools in the system are illegally segregated, Green v. New Kent County; Henry v. Clarksdale; United States v. Hinds County."

*February 5, 1970, page 3, ¶5:* "That no school be operated with an all-black or predominantly black student body."

*February 5, 1970, page 4, ¶9:* "That the defendants maintain a continuing control over the race of children in each school, just as was done for many decades before Brown v. Board of Education, and maintain the racial make-up of each school (including any new and any re-opened schools) to prevent any school from becoming racially identifiable."

*February 5, 1970, page 4, ¶13:* "That the Board adopt and implement a continuing program, computerized or otherwise, of assigning pupils and teachers during the school year as well as at the start of each year for the conscious purpose of maintaining each school and each faculty in a condition of desegregation."

*Supplementary Findings of Fact dated March 21, 1970, page 10, ¶26:* "Some 600 or more pupils transfer from one school to another or register for the first time into the system during the course of each month of the typical school year. It is the assignment of these children which is the particular subject of the reference in paragraph 13 of the order to the manner of handling assignments within the school year."

*February 5, 1970, pages 4 and 5, ¶16:* "The duty imposed by the law and by this order is the desegregation of schools and the maintenance of that condition. The *plans* discussed in this order, whether prepared by Board and staff or by outside consultants, such as computer expert, Mr. John W. Weil, or by Dr. John A. Finger, Jr., are *illustrations* of *means or partial means to that end.* The defendants are encouraged to use their full 'know-how' and resources to attain the *results* above described, and thus to achieve the constitutional end by any means at their disposal. The test is not the method or plan, but the *results.*"

This court's judgment is in effect today only through force of the June 29, 1970 order of the Supreme Court of the United States, which, in granting certiorari, directed that

" * * * the judgment of the Court of Appeals is left undisturbed insofar as it remands the case to the district court for further proceedings, which further proceedings are authorized and the district court's judgment is reinstated and shall remain in effect pending those proceedings."

On the facts related in the reports of the School Board attorneys, the operation of the predominantly black schools as described is not in compliance with the orders cited above.

Overcrowding, on the facts as described, though undesirable, is not a constitutional problem; its solution is unrelated to desegregation; it is a matter for the School Board, not the court, to deal with.

Pending decision of the appeal by the Supreme Court, action on the motion of the plaintiffs is postponed.

This the 5th day of October, 1970.

[s] James B. McMillan

James B. McMillan
United States District Judge