George **MARTIN** et al., Plaintiffs,

v.

**CHARLOTTE–MECKLENBURG BOARD OF EDUCATION, Defendant,**

**and**

**Carrie L. Graves et al., Intervening Defendants.**

**No. C–C–78–220.**

United States District Court, W. D. North Carolina, Charlotte Division.

Aug. 10, 1979.

---

Whiteford S. Blakeney, Blakeney, Alexander & Machen, Charlotte, N. C., for plaintiffs.

William W. Sturges and Hugh B. Campbell, Jr., Weinstein, Sturges, Odom, Bigger, Jonas & Campbell, P.A., Charlotte, N. C., for defendant Charlotte-Mecklenburg Board of Education.

Julius LeVonne Chambers, Chambers, Stein, Ferguson & Becton, Charlotte, N. C., for added and intervening defendants.

McMILLAN, District Judge.

| | | Page No. |
|---|---|---|
| I. | SUMMARY OF DECISION | 1320 |
| II. | THE THEORY OF THE PLAINTIFFS | 1322 |
| III. | RELEVANT HISTORY OF THE CHARLOTTE–MECKLENBURG SCHOOLS—A GENERAL SUMMARY | 1324 |
| IV. | HISTORY OF CHARLOTTE–MECKLENBURG SCHOOLS (CONTINUED); MORE DETAIL ON THE FOUR ASPECTS OF PUPIL ASSIGNMENT WHICH ARE PRINCIPALLY IN QUESTION HERE | 1328 |
| | A. CONSTRUCTION, LOCATION AND CLOSING OF SCHOOL BUILDINGS CONTINUE TO PROMOTE SEGREGATION | 1329 |
| | B. PLACEMENT OF KINDERGARTEN AND ELEMENTARY SCHOOL GRADES REMAINS DISCRIMINATORY AND UNFAIR TO THE SMALLEST BLACK CHILDREN | 1332 |
| | C. FAILURE TO MONITOR THE THOUSANDS OF PUPIL TRANSFERS EACH YEAR, IN THE CONTEXT OF THE "FEEDER PLAN" AND LONG-STANDING HOUSING SEGREGATION, TENDS TO PROMOTE SEGREGATION IN THE SCHOOLS | 1335 |
| | D. DISCRIMINATORY BURDENS OF DESEGREGATION REMAIN UPON THE BLACK CHILDREN | 1338 |
| V. | THE 1978 PUPIL ASSIGNMENT PLAN SHOULD BE UPHELD | 1340 |
| | A. THERE HAS BEEN NO PRIOR COMPLETE IMPLEMENTATION OF A JUDICIAL REMEDY RELATING TO PUPIL ASSIGNMENT | 1340 |

Page
No.

B. THE CONTINUING PROBLEMS DEALT WITH BY THE 1978 PLAN ARE WITHIN THE SUBSTANTIAL, IF NOT THE EXCLUSIVE, CONTROL OF THE SCHOOL BOARD .......................................... 1340

C. THE 1974 PLAN AND THE ORDER APPROVING IT SPECIFICALLY CONTEMPLATED THE LATER APPRAISAL AND THE MODIFICATIONS WHICH WERE MADE IN 1978 .......................................... 1340

D. THE 1978 PLAN AND CHANGES ARE ALSO BASED UPON AN INDEPENDENT COMMITMENT OF THE SCHOOL BOARD AS A MATTER OF PUBLIC POLICY TO MAINTAIN A DESEGREGRATED SCHOOL SYSTEM WITHOUT REGARD TO COURT INTERVENTION ....................... 1342

E. RACE IS ONLY ONE OF SEVERAL SIGNIFICANT FACTORS CONSIDERED BY THE BOARD AND STAFF IN PUPIL ASSIGNMENT ................. 1343

F. THE BOARD HAD LAWFUL DISCRETION TO MAKE THE 1978 ASSIGNMENTS IT DID MAKE .......................................... 1344

G. PLAINTIFFS HAVE SHOWN NO INJURIES JUSTIFYING RELIEF ......... 1345

VI. CONCLUSION: THE CONTINUING PROBLEMS THAT REMAIN SHOULD BE LEFT IN THE HANDS OF THE SCHOOL BOARD ........................... 1346

VII. ORDER .......................................................... 1347

## I.

### SUMMARY OF DECISION

Plaintiffs, a group of parents and children, brought this suit against the Charlotte-Mecklenburg, North Carolina, Board of Education, seeking an order prohibiting the Board from assigning pupils pursuant to the Board's 1978 pupil assignment plan. Under that plan, 2,050 white and 2,775 black children (out of approximately 78,000) were reassigned. One reason for many of these transfers was to prevent re-segregation of certain schools. Plaintiffs allege that race was the significant element, or at least a major element, in those assignments; that racial discrimination had ceased with the adoption and implementation of the pupil assignment plan of 1974; and that race could not be lawfully considered for any purpose thereafter.

The pupil assignment plan under attack was adopted pursuant to orders of this court originally affirmed by *Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) and orders later based upon that decision, and in accordance with independent policy decisions by the School Board itself that it would maintain and operate a desegregated school system. In arriving at those decisions the School Board expressly considered numerous policy matters including quality education for all students (the "main goal"); desegregated schools as a necessary part of that goal; grade structures and specialized schools appropriate to educational needs; the lack of planning among the "feeder areas" of the system; the need for coordination with other community planning agencies; the problems of those schools whose student bodies are almost all economically deprived; parental preferences; student safety; the desire to recognize "neighborhood" in school assignments when possible; the most economical use of school property and facilities, including transportation; and the Board's educational policy that *regardless of what previous Boards might have done, and independent of court orders,* this Board considered it educationally desirable to have the races represented in the various schools in the proportions produced by the 1978 plan.

The School Board vigorously defended its actions, ably asserting its contentions based

upon numerous essential facts including those briefly stated above. It pointed out that no student is denied the opportunity to go to school in this community because of race or any other invidious classification; that the Board is making a serious effort to provide substantially equal opportunity at all schools; that these facts are materially different from *Bakke* because unlike *Bakke* nobody has been turned away from the schoolhouse door; and that

> "[only] [w]hen a classification denies an individual opportunities or benefits enjoyed by others solely because of his race or ethnic background, it must be regarded as [constitutionally] suspect."

*University of California Regents v. Bakke,* 438 U.S. 265, 305, 98 S.Ct. 2733, 2756, 57 L.Ed.2d 750 (1978).

Carrie Graves and others sought permission to intervene and were allowed to intervene as defendants on behalf of themselves and a class of black pupils attending or eligible to attend the Charlotte-Mecklenburg schools. They are represented by the attorneys who represented Swann and the other plaintiffs in the original *Swann* case. They oppose the contentions of plaintiffs here.

This is the third suit filed by the same lawyers seeking to nullify *Swann*. The first such case, *Moore, et al. v. Charlotte-Mecklenburg Board of Education,* was filed February 27, 1970, attacking the court's rulings in *Swann* because North Carolina had a "no bussing" law. A few weeks later a three-judge court held unconstitutional the North Carolina statute prohibiting "bussing" and assignment of pupils by race. On April 20, 1971, contemporaneously with its principal *Swann* decision, the United States Supreme Court held North Carolina's "anti-bussing law" unconstitutional, *North Carolina State Board of Education v. Swann, et al.,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586, and dismissed the *Moore* case, *Moore, et al. v. Charlotte-Mecklenburg Board of Education, et al.,* 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590 (April 20, 1971). The second case, *Cuthbertson, et al. v. Charlotte-Mecklenburg Board of Education,* was filed on March 29, 1973, and was dismissed by order dated July 30, 1975. It was appealed to the Fourth Circuit Court of Appeals, which dismissed without opinion on March 18, 1976 (535 F.2d 1249). On October 4, 1976, the Supreme Court denied petition for certiorari. 429 U.S. 831, 97 S.Ct. 92, 50 L.Ed.2d 95. The factual contentions in that case were much the same as those in the case at bar, and the issues are much the same as those decided in the original *Swann* case. *Res judicata,* laches and collateral estoppel are pleaded, perhaps with merit, by the intervening defendants.

However, since these plaintiffs today contend that *any* consideration of race in pupil assignment in the Charlotte-Mecklenburg Schools is unlawful under *Bakke, supra,* and under *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), it becomes the duty of the court to consider plaintiffs' claims in light of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), *Swann, Pasadena* and *Bakke.* There is no way to do this without a factual survey of the Charlotte-Mecklenburg schools and how they got where they are, and why the Board considers race, among other factors, in pupil assignment.

For that purpose, two hearings were conducted and much research was done. The first hearing was a preliminary conference with counsel, and the second was a two-day evidentiary hearing. Few plaintiffs appeared; no plaintiff testified; plaintiffs offered no live evidence but offered and relied upon a few written exhibits and admissions from the pleadings. Defendant School Board and the intervening "*Swann*" defendants (Carrie Graves and others) offered exhibits and lengthy testimony. I have also re-examined and considered the hundreds of pages of findings of fact and orders from the original *Swann* case, most of which are reported in the *Federal Supplement* and *Supreme Court* reports.

From that survey and from *Brown, Swann, Pasadena* and *Bakke,* I have concluded that the challenged actions of the School Board are thoroughly within constitutional limits and should be upheld.

## II.

### THE THEORY OF THE PLAINTIFFS

Plaintiffs concede that after *Brown v. Board of Education* (1954), the Charlotte-Mecklenburg schools were unlawfully segregated. They say, however, that in 1974, after five years of heated litigation, the School Board adopted a pupil assignment plan which has been implemented according to its terms; that its terms call for elimination of all segregation and establishment of neutral pupil assignment patterns; and that from some time during or shortly after the adoption of that plan in 1974, the local schools have been "unitary," and that thereafter assignment of pupils may not take race into account. Plaintiffs rely principally upon *Bakke* and *Pasadena,* cited above.

In *Pasadena,* the plaintiff was the local school board itself. The board sought relief from a district court order four years old which, to eliminate segregation, had required that "there shall be no school in the District . . . with a majority of any minority students," 427 U.S. at 428, 96 S.Ct. at 2701 (quoting 311 F.Supp. 501, 505 (C.D. Cal.1970)). Mr. Justice Rehnquist wrote for the Supreme Court. He took note of the trial judge's statement that his 1970 order "meant to me that at least during my life time there would be no majority of any minority in any school in Pasadena," 427 U.S. at 433, 96 S.Ct. at 2703. He read the district judge's statement as a belief that he "had authority to impose this requirement even though subsequent changes in the racial mix in the Pasadena schools might be caused by factors for which the defendants could not be considered responsible." *Id.* at 434, 96 S.Ct. at 2704. He took note of the stipulation of counsel that the pupil assignment plan had been implemented in 1970 and had been found by the trial judge to be "in conformance with the Judgment entered herein January 23, 1970." In addition, he treated the case as one in which the board had "*implemented a racially neutral attendance pattern* in order to remedy the perceived constitutional violations . . ." 427 U.S. at 436–37, 96 S.Ct. at 2705 (emphasis added).

The decision in *Pasadena* is consistent with the Supreme Court's ruling in *Swann, supra,* with regard to the scope and duration of the district court's remedial authority. The *Swann* court stated:

"The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. Segregation was the evil struck down by *Brown I* as contrary to the equal protection guarantees of the Constitution. That was the violation sought to be corrected by the remedial measures of *Brown II.* That was the basis for the holding in *Green* that school authorities are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.' 391 U.S. [430], at 437–438 [88 S.Ct. 1689, 20 L.Ed.2d 716].

"If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

\*　　\*　　\*　　\*　　\*　　\*

". . . However, a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. *The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution.*

\*　　\*　　\*　　\*　　\*　　\*

". . . In default by the school authorities of their obligation to proffer acceptable remedies, *a district court has broad power to fashion a remedy that will assure a unitary school system.*"

402 U.S. 1, at 15–16, 91 S.Ct. 1267, at 1275–1276, 28 L.Ed.2d 554 (1971) (emphasis added).

In that same opinion, the Court generally defined the boundaries of remedial action:

"It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies *once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system.* This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities *or some other agency of the State* has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary."

*Id.* at 31–32, 91 S.Ct. at 1284 (emphasis added).

In his opinion in *Pasadena,* Justice Rehnquist suggested that, in some circumstances, specific types of remedial action, in the face of school board opposition, are unauthorized notwithstanding that a unitary school system has *not* in all respects been achieved at the time the remedial action is taken:

"It may well be that petitioners have not yet totally achieved the unitary system contemplated by . . . *Swann.* There has been, for example, dispute as to petitioners' compliance with those portions of the plan specifying procedures for hiring and promoting teachers and administrators. . . . But that does not undercut the force of the principle underlying the . . . language from *Swann.* In this case the District Court approved a plan designed to obtain racial neutrality in the attendance of students at Pasadena's public schools. *No one disputes that the initial implementation of this plan accomplished that* [sic] *objective.* That being the case, the District Court was not entitled to require the PUSD to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity."

*Pasadena, supra* 424 U.S. at 436, 96 S.Ct. at 2705 (additional emphasis added).

Justice Rehnquist clarifies this language somewhat in a later passage:

". . . For *having once implemented a racially neutral attendance pattern* in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy *for previous racially discriminatory attendance patterns.*"

*Pasadena, supra* at 437, 96 S.Ct. at 2705 (emphasis added).

The *Pasadena* opinion thus impliedly recognizes that school desegregation orders may deal with distinct and separable elements of a school operation. If those various elements are truly independent, then it is possible that a school board may achieve compliance as to some elements with some orders sooner than with others. It would then appear that a court might be required to continue remedial orders as to independently discriminatory elements but to discontinue such orders as to independent *non-*discriminatory elements.

■ Whether any two or more facets of a school operation are interdependent or independent is, of course, a question of fact. If they are dependent upon each other, then all such facets are subject to continuing remedial orders, until discrimination has been eliminated with respect to those and all other facets of school operation with which they share a mutual dependency. *See, e. g., Brown v. Board of Education,* 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083, *quoted in Swann, supra,* 402 U.S. at 12–13, 91 S.Ct. at 1274 ("To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with . . constitutional principles . . . ."); *Swann, supra* at 20–21, 91 S.Ct. 1267 (express recognition of the interrelation of school placement and patterns of residential development) and 14, 91 S.Ct. 1275 (express recognition that patterns of residential development, as well as other community

changes, have the capacity of "neutralizing or negating remedial action before it [is] fully implemented"); *cf., Pasadena, supra* 424 U.S. at 435, 96 S.Ct. 2697 (holding of *Pasadena* not applicable to implementation of later steps in primary, step-by-step desegregation plan), 436, 96 S.Ct. 2697 (no dispute as to fact of prior complete implementation of school attendance plan).

Therefore, in determining whether plaintiffs have made out their claim for injunctive relief under *Pasadena* (assuming, for purpose of discussion, that *Pasadena* applies), the court must determine which aspects of its remedial orders in *Swann* were independent, as well as which aspects were implemented in fact.

### III.

### RELEVANT HISTORY OF THE CHARLOTTE–MECKLENBURG SCHOOLS —A GENERAL SUMMARY

*Before Brown (1954) the Charlotte-Mecklenburg schools were totally segregated in law and fact.*—For three centuries racial segregation was the law of the land. North Carolina, like many other states, had and enforced laws requiring racial segregation in almost all public (and many private) facilities, accommodations and activities, including, among others, schools, colleges, orphanages, medical facilities, prisons and other detention facilities, theaters, busses, trains, restaurants, restrooms, water fountains, tax records, housing, financing of housing, zoning, weddings and burials. A seventeen-page fine-print collection of such laws appears in the *Swann* order of August 3, 1970, reported in D.C., 318 F.Supp. 786, 804–820. School segregation, accelerated by the tragic "separate but equal" error of the Supreme Court in *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed.2d 256 (1896), was the law of the land throughout the south and some other areas. In North Carolina segregated schools were rigidly maintained up to *Brown* (1954), and were substantially maintained thereafter. *See Swann v. Charlotte-Mecklenburg Board of Education*, 300 F.Supp. 1358 (W.D.N.C. 1969).

*Unlawful segregation continued long after the Brown decisions.*—This was the essential finding of this court's order of April 23, 1969, 300 F.Supp. 1358. Such segregation had continued after *Brown* and had not been substantially remedied by the actions of the defendants pursuant to the 1965 order of then district judge J. Braxton Craven, Jr., approving a limited "school closing" "desegregation" plan.

A motion for further relief was filed in September 1968 in the *Swann* case. Lengthy evidence was taken and volumes of exhibits were received (virtually all from School Board and other public records) on the state of the Charlotte-Mecklenburg schools and how they got that way.

From the evidence the court concluded that segregation of schools, like the segregation of housing and other activities, was the result of the combined actions of many generations of federal, state, and local governments (including school authorities), and that school segregation was inseparable from the legally legislated and legally financed segregation of residences and discriminatory location of schools. Part of that history was summarized in the *Swann* order of April 23, 1969:

"... Charlotte (270,000-plus) sits in the center of Mecklenburg County (550 square miles, total population over 335,000). The central city may be likened to an automobile hub cap, the perimeter area to a wheel, and the county area to the rubber tire. Tryon Street and the Southern Railroad run generally through the county and the city from northeast to southwest. Trade Street runs generally northwest to southeast and crosses Tryon Street at the center of town at Independence Square. Charlotte originally grew along the Southern railroad tracks. Textile mills with mill villages, once almost entirely white, were built. Business and other industry followed the highways and the railroad. The railroad and parallel highways and business and industrial development formed something of a barrier between east and west.

"By the end of World War II many Negro families lived in the center of Charlotte just east of Independence Square in what is known as the First Ward-Second Ward-Cherry-Brooklyn area. However, the bulk of Charlotte's black population lived west of the railroad and Tryon Street, and north of Trade Street, in the northwest part of town. The high priced, almost exclusively white, country was east of Tryon Street and south of Trade in the Myers Park-Providence-Sharon-Eastover areas. *Charlotte thus had a very high degree of segregation of housing before the first Brown decision.*

"Among the forces which brought about these concentrations should be listed the original location of industry along and to the west of the Southern railroad; the location of Johnson C. Smith University two miles west of Tryon Street; the choice of builders in the early 1900's to go south and east instead of west for high priced dwelling construction; the effect of private action and public law on choice of dwelling sites by black and by white purchasers or renters; real estate zoning which began in 1947; and the economics of the situation which are that Negroes have earned less money and have been less able to buy or rent expensive living quarters.

"Local zoning ordinances starting in 1947 generally allow more varied uses in the west than in the east. Few if any areas identified as black have a residential restriction stronger that R–6, which means that a house can be built on a lot as small as 6,000 square feet. Zoning restrictions in other areas go as high as 12,000 and 15,000 square feet per lot. Nearly all industrial land in the city is in the west. The airport in the southwest with its jet air traffic inhibits residential development. Many black citizens live in areas zoned industrial, which means that the zoning law places no restriction on the use of the land. The zoning laws follow the pattern of low cost housing and industry to the west and high cost housing with some business and office developments to the east.

"City planning has followed the same pattern.

"Tryon Street and the Southern railroad were not built to segregate races. In the last fifteen years grade crossings have been eliminated at great expense at Fourth Street, Trade Street, Twelfth Street and Independence Boulevard; and an elevated half-mile bridge, the Brodie Griffith Skyway, is now being built across the railroad in North Charlotte at a cost of more than three million dollars. The ramparts are being pierced in many spots and inner-city highways now under construction will make communication much simpler.

"*However, concentration of Negroes in the northwest continues.* Under the urban renewal program thousands of Negroes were moved out of their shotgun houses in the center of town and have relocated in the low rent areas to the west. This relocation of course involved many ad hoc decisions by individuals and by city, county, state and federal governments. Federal agencies (which hold the strings to large federal purses) reportedly disclaim any responsibility for the direction of the migration; they reportedly say that the selection of urban renewal sites and the relocation of displaced persons are matters of decision ('freedom of choice'?) by local individuals and governments. This may be correct; the clear fact however is that the *displacement occurred with heavy federal financing and with active participation by local governments, and it has further concentrated Negroes until 95% or so of the city's Negroes live west of the Tryon—railroad area, or on its immediate eastern fringes.*

"Onto this migration the 1965 school zone plan with freedom of transfer was superimposed. The Board accurately predicted that black pupils would be moved out of their midtown shotgun housing and that white residents would continue to move generally south and east. Schools were built to meet both groups. Black or nearly black schools resulted in

the northwest and white or nearly all white schools resulted in the east and southeast. Freedom of students of both races to transfer freely to schools of their own choices has resulted in re-segregation of some schools which were temporarily desegregated. The effect of closing the black inner-city schools and allowing free choices has in overall result tended to perpetuate and promote segregation."

300 F.Supp. 1358, 1365–66 (emphasis added).

The April 23, 1969, order directed the School Board to desegregate the schools, partly in the fall of 1969 and the remainder in the fall of 1970.

The April 1969 order was followed by four years of further litigation, appeals, school district and pupil assignment reorganizations and community controversy over the fundamental issues of race and education. Since 1974 long steps have been taken towards putting the race question behind us in the field of public education. Nevertheless, some of the results and practices of the past remain, and a brief review of that immediate past is highly pertinent to the questions raised by this suit.

The order of April 1969 was not well received.

Second Ward was a black high school on a site adjacent to the School Board offices on McDowell Street, and was ideally located to make desegregation of the county high schools easy. The community had voted bonds to build on the Second Ward site a Metropolitan High School. Shortly after the April 1969 order specifying that the new school would have to be desegregated, the Board closed Second Ward High School and abandoned all plans for Metropolitan High. Thus began a new cycle of closings of inner-city black schools, which made desegregation of the entire county physically more difficult.

More school closings took place in the summer of 1969; seven all-black schools including Second Ward were closed and the students were reassigned, thereby further complicating desegregation efforts; see 306 F.Supp. 1299, 1302, for the abortive results of that school closing episode.

No plans for complete desegregation of the schools were proposed by the Board, despite several orders of court. Finally, in December 1969, an order was entered (306 F.Supp. 1299, 1313) requiring the Board to cooperate with a consultant to be appointed by the court. A consultant, Dr. Jack Finger, was appointed. The Board remained free to develop plans of its own, 306 F.Supp. at 1314.

The consultant, after many weeks of study, drafted a pupil assignment plan. That plan, enlarged pursuant to suggestions from as yet unidentified members of the school staff so as to include the whole county, was ordered into effect on February 5, 1970, 311 F.Supp. 265. The order approving the plan contained the requirement:

"That the defendants maintain a continuing control over the race of children in each school, just as was done for many decades before *Brown v. Board of Education*, and maintain the racial make-up of each school (including any new and any re-opened schools) to prevent any school from becoming racially identifiable."

That order was stayed by the Fourth Circuit, but was ordered into effect by the Supreme Court and was in effect for the 1969–70 school year. It was eventually affirmed in toto by the Supreme Court. 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

Following the February 5, 1970 order, a working majority of the then School Board did a number of things to make desegregation difficult and re-segregation likely. Those matters will be discussed in somewhat more detail later in this order, but they are mentioned now briefly because their effects linger on and the practices then established are still in some substantial particulars being followed. They include:

(a) Adoption of the "feeder" plan, which divided the single school district into ten separate "feeder areas," thereby making desegregation materially more difficult. It also put more children on busses. In 1969–70 some 23,600 children rode school busses (334 F.Supp. 626–27),

and about 5,000 were transported at reduced rates though apparently at their own expense by contract haulers such as Charlotte City Coach Lines (*see* Supplementary Findings of Fact, March 21, 1970, paragraphs 11, 14). In 1970 a statewide regulation took effect, providing transport for the first time for all city children who lived more than 1½ miles from school. The Finger Plan (the only plan ever mandated by the court) also took effect that fall. The Finger Plan, *plus* the new state regulation, increased the number of students riding school busses or city busses from about 28,600 in 1969–70 to about 39,000 in October 1970. The Board's 1971 "Feeder Plan" then increased the number of students bussed to about 46,667, an additional increase of over 7,500 (334 F.Supp. 626–27).

(b) Insistence upon residence ("neighborhood school theory") as the normal and presumptive basis of pupil assignment, 300 F.Supp. 1358, 1369 (1969).

(c) Closings of "black" schools whose continued use would minimize transportation and desegregation problems, 328 F.Supp. 1346, 1347 (1971).

(d) Use of mobile units to enlarge "white" schools while depopulating centrally located "black" schools, 328 F.Supp. 1346, 1350–51 (1971).

(e) Refusal to adopt (or at least to admit the adoption of) a system of monitoring transfers among schools so as routinely to promote desegregation and prevent re-segregation, all in violation of the order of February 5, 1970 (311 F.Supp. 265, 268).

A full description of those problems as of October 21, 1971, is contained in 334 F.Supp. 623, 626–29, which summarizes the then continuing vitality of segregative actions of the Board and includes the reminder that "racial discrimination through official action has not ended when a school board knowingly adopts a plan likely to cause a return to segregated schools and then refuses to guard against such re-segregation," 334 F.Supp. at 629.

The continuation of those problems was again fully noted in a June 19, 1973, review of the "feeder plan" and signs of continuing discrimination, 362 F.Supp. 1223, 1232–37. By that time the regressive effects of the "feeder plan" had become apparent and the court directed the preparation of a new plan for the fall of 1974, the following year. The Board repeatedly refused to adopt measures to guard against re-segregation of the schools, which was the natural and probable consequence of the "feeder plan" and related assignment policies.

In the fall and winter of 1973–74 one of those happy events occurred which often takes place when people of good will become concerned about public affairs. A Citizens Advisory Group was organized to make recommendations to the School Board. It was composed of some members selected at large, but about half of its members were persons who were already members of the school "committees" of the various high schools. Its co-chairpersons were two remarkable and public spirited young women, Mrs. Margaret Ray and Mrs. Betsy Bennett. They met and after a considerable amount of work presented some recommendations to the School Board. Their recommendations were not adopted. By April of 1974 time was running out. The court requested the Citizens Advisory Group to draft a new plan for pupil assignment which would meet the essential requirements of fairness and stability contemplated by existing orders of court. The School Board was directed to provide personnel and technical assistance and information as requested by the Citizens Advisory Group. *See Swann* order of April 3, 1974, docket entry number 341. Within weeks, the citizens Advisory Group presented a complete plan which, after long periods of revision and compromise, was adopted by the Board on July 9, 1974. The plan was approved by an order of July 30, 1974, 379 F.Supp. 1102, reading in part as follows:

"Upon the express assumption and condition that the Board of Education will constructively implement and follow all of its new guidelines and policies (Exhibit A to this order), which were adopted by

the Board on July 9, 1974 . . . and subject to the further conditions stated below, the court approves those guidelines and policies and the proposals for pupil assignments.

\* \* \* \* \* \*

"The future depends upon the implementation of the new guidelines and policies. This approval is expressly contingent upon the implementation and carrying out of all the stated policies and guidelines. Here is the heart of the matter. Only if they are thus implemented is it likely that a fair and stable school operation will occur, and that the court can close the case.

\* \* \* \* \* \*

"Because of the obvious change in Board attitude, it will be assumed that the new Board has taken charge of desegregation in the schools and that they will read and follow and implement their own 'book'—the guidelines and adopted policy recommendations. It will be assumed that the *sizeable continuing problems yet remaining* will be resolved by spontaneous action by staff or board, with input as needed from the Citizens Advisory Group and other community 'ombudsmen.' "

379 F.Supp. 1102, 1103, 1105 (emphasis added).

The "CAG plan" brought about substantial peace among the warring factions, and pupil assignments have been made pursuant to it since 1974. The three-year re-evaluation which the plan promised for 1977 had to be made a year late because of a turnover in the office of superintendent, but it was finally made; and a series of re-assignments of pupils and other modifications were adopted by the Board in the spring of 1978 to comply with existing court orders, and to carry out the Board's own resolution, to keep the schools desegregated.

It is those 1978 modifications which plaintiffs challenge.

\* \* \* \* \* \*

The original *Swann* parties have not revived those old questions; they are in fact intelligently coping with the residue of our centuries of segregation; and in this suit *they have joined together in asking the court to let the situation alone*—as the court has been happy to do since 1974. The analysis of the present state of affairs which follows is therefore made with considerable reluctance, even though it is made necessary by the realities of the suit. The legacy of the past is still with us; pressures toward resegregation are constant, heavy and insistent; and school boards in this community may have to cope with segregation problems for some time to come.

\* \* \* \* \* \*

IV.

HISTORY OF CHARLOTTE-MECKLENBURG SCHOOLS (CONTINUED); MORE DETAIL ON THE FOUR ASPECTS OF PUPIL ASSIGNMENT WHICH ARE PRINCIPALLY IN QUESTION HERE

Plaintiffs say that segregation is over in the Charlotte-Mecklenburg schools and that under *Bakke* and *Pasadena* race may no longer be considered in pupil assignment.

Defendant School Board says that though the 1978 plan may be required by orders of court, it is separately justified by the Board's independent commitment to maintain desegregated schools, regardless of court orders.

Intervening ("Swann") defendants say that segregation still persists; that the badges of discrimination described in previous court orders are still obvious; and that what the Board did in 1978 is not only justified but required by the law. The contentions and evidence of intervening defendants relate primarily to four aspects of pupil assignment that were subject to remedial orders in the *Swann* case. Those four aspects are:

(a) Construction, location and closing of school facilities, including mobile units.

(b) Placement of elementary and kindergarten grades in the schools.

(c) Pupil assignment and transfer policy.

(d) The unequal burdens on black children compared to the burdens on white children.

These four elements will be discussed separately. Some repetition of the above history may take place; that repetition is to insure that the essential history of each of these aspects of school operation can be fully considered.

A. CONSTRUCTION, LOCATION AND CLOSING OF SCHOOL BUILDINGS CONTINUE TO PROMOTE SEGREGATION.

On April 23, 1969, it was found as a fact that the schools were still largely segregated, 300 F.Supp. 1358, 1367. Most children attended all-white or all-black schools. Second Ward was the only black high school in the center of the urban area. A bond issue had been passed and the School Board had money and plans to replace Second Ward with a Metropolitan High School, a specialty "magnet" school. Second Ward had a good central location, easily accessible to both blacks and whites, and an ideal spot for a high school to make desegregation of high schools easy. Shortly after desegregation was ordered on April 23, 1969, the School Board cancelled its plans for Metropolitan High School, 300 F.Supp. 1381, 1383. It was never built. This action has complicated and tremendously increased the cost and inconvenience of all subsequent activity to desegregate high schools.

In the summer of 1969 a school-closing desegregation plan was proposed by the Board. Its principal feature was the closing of seven all-black inner-city schools and the reassignment of the children to white schools. This plan was approved reluctantly, despite its excessive burdens on black children, because it appeared to promise better education for 4,245 black children, 306 F.Supp. 1291. It largely failed to accomplish this purpose. The sad results of that maneuver are described in 306 F.Supp. 1299, 1302; it transferred to "white" schools only 1,315 instead of the promised 4,245 black pupils.

The court also ordered a report on all proposed school construction projects and directed the Board to retain all land it owned in the mid-city area.

On December 1, 1969, the court disapproved the Board's report on construction projects and disapproved generally the desegregation plan then proposed. One of the grounds was that the Board intended to continue to keep 100% black all of the seven all-black elementary schools then remaining in the system, 306 F. Supp. 1299, 1307.

After the Supreme Court had ordered into effect the court's desegregation plan of February 5, 1970, the School Board proposed a "feeder" plan which, among other things, called for the elimination of two black inner-city schools (Double Oaks Elementary and Northwest Junior High), and the reduction of West Charlotte High, the only remaining formerly black high school, to about 60% of capacity. On June 22, 1971, the court found the plan to be characterized by the "abandon[ment of] property in . . . wholesale fashion to *preserve* discrimination." 328 F.Supp. 1346, 1352. The plan was disapproved as "regressive and unstable in nature and results," 328 F.Supp. 1346, 1350.

A week later, on June 29, 1971, the court reviewed a further proposed revision for the 1971–72 school year, which largely restored West Charlotte High School and Northwest Junior High, but again proposed the closing of (formerly black) Double Oaks Elementary, on the alleged ground that the school was inaccessible because of its location in a cul-de-sac. . The court, however, found that *in fact the Board owned a right of way*, at the time passable, which with a small amount of improvement would solve the access problems, 328 F.Supp. 1346, 1348. It appeared that an underlying concern of the Board was that "white flight" would prevent desegregation of this inner-city school, a rationale which the Supreme Court in *Monroe v. Commissioners*, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), had held to be inadequate to overcome constitutional obligation, 328 F.Supp. at 1352.

On October 21, 1971, the court reviewed the School Board's recent actions and noted

that decisions about facilities were having an adverse impact on compliance with the Board's constitutional obligations in the pupil assignment area:

"In addition, several highly specific official actions of the school board itself since the April 1971 decision of the Supreme Court have added new official pressures which tend to restore segregation in certain schools. These are the construction program (use and location of mobile units); the under-population and proposed closing of formerly black schools; and several recent decisions about pupil assignments and transfers. The current plan contemplates use of 232 mobile units. These units, in the main, are located or scheduled for location at suburban schools remote from the black community. Simultaneously, the formerly black schools, with few exceptions, are being operated at considerably less than capacity."

334 F.Supp. 623, 628.

In June 1973, the question of the location and use of school facilities was raised again, this time in the context of proposed plans for the 1973–74 school year. The court approved in large measure the Board's proposal, which, for the first time, substantially breached the insularity of southeast Mecklenburg from the burdens accompanying desegregation. However, it pointed out several "signs of continuing discrimination." One of those signs was the apparent continuation of the attack on the vitality of West Charlotte High School, a modern but formerly all-black school. The proposed plan called for a dramatic increase in facilities at the outlying white schools through the increased use of mobile classrooms, while again reducing the assignments of pupils to West Charlotte and other inner-city and northwest schools. The court found the continuing effort to keep West Charlotte under capacity resulted from its identity as a "black" school and from pressure to close the school as soon as the court would permit. No substantial educational or administrative reason was advanced to support the Board's position. 362 F.Supp. 1232–33. The court summed up "The 'leap-frog' problem" which resulted from a combination of facility location and attendance line-drawing called the "feeder plan":

". . . The pupil assignment plan has a fundamental, built-in impediment, which makes all desegregation efforts more difficult and inconvenient than need be. This is the creation, as the first step in desegregation, mostly within the near reaches of the south and east part of the district, of walk-in schools, before dealing with problems of desegregating outlying schools. These walk-in schools tend to absorb the black students who live in the central and south parts of the city. Desegregation of east and southeast white schools and northwest black schools can then be accomplished only by a 'leap-frog' operation, transporting children long distances *across* the center of the city, instead of shorter distances along radii *into* and *out of* the center of the city."

362 F.Supp. at 1236 (emphasis in original).

The 1974 joint proposal of the School Board and the Citizens Advisory Group (CAG) was dated July 9, 1974, filed for approval July 10, 1974, and approved by the court July 30, 1974. It contains the following "Basic Guideline" to govern future decision making on school facilities:

"XI. *Future Site Selection*: School planning is not to be predicated on population growth trends alone; consideration is to be given to the influence new building can be toward *simplification of an integrated pupil assignment plan. Buildings are to be built where they can readily serve both races.*

"When consideration is being given to the closing of any school, or its conversion to another program, the impact of such action on an integrated school system should be taken into account. *The closing or conversion should not jeopardize the integrated status of the system.*"

School Board Exhibit 3, ¶ 11 at 4 (emphasis added).

On July 11, 1975, the court removed *Swann* from the active docket, while retaining jurisdiction, and noted: "Though continuing problems remain, as hangovers from previous active discrimination, defendants are actively and intelligently addressing these problems without court intervention." D.C., 67 F.R.D. 648, 649.

Since 1974, five major changes in facilities have occurred in the public school system. The School Board opened Piney Grove Elementary School and J. H. Gunn Elementary School, moved the Sharon Elementary School facility, opened Northeast Junior High School, and, under the 1978–79 plan, closed Wilmore Elementary School. Transcript at 105–110, 167.

*Piney Grove Elementary School.*—Piney Grove, opening two years ago and housing grades K (kindergarten) through 3, is located in the southeast quadrant of the county, approximately three miles south of Idlewild Elementary School. It is situated in a predominantly white residential community. Transcript at 106–108, 148 (Testimony of Dr. Wayne Church, Manager of Research for the School Board); School Board Exhibit 20. The base attendance area for Piney Grove is on the boundary line of the Idlewild school attendance area, within a few miles of Piney Grove. The black elementary school students who attend Piney Grove live in Lincoln Heights, a predominantly black area in the northwest quadrant of the city, between eight and ten miles from the school and on the opposite side of the industrialized mid-city area. Transcript at 107–08; School Board Exhibit 20. At the time the School Board approved the location of Piney Grove, it was aware that the school was to be placed in a predominantly white residential area and that black students would have to be brought eight to ten miles to the school from the inner city. Transcript at 242 (Testimony of Phillip O. Berry, Chairman of the School Board).

*J. H. Gunn Elementary School.*—The J. H. Gunn school operates on the campus formerly housing the Northeast Junior High School, in the far eastern portion of the county. It serves grades K through 6.

Transcript at 108–09 (Testimony of Dr. Wayne Church); School Board Exhibit 20. The school is located in the immediate area of the J. H. Gunn community, in which approximately 75 black, school age children reside. Transcript at 159–60 (Testimony of Dr. Wayne Church); School Board Exhibit 20. At its inception, the School Board was aware of the necessity of transporting black elementary school children many miles from the inner city to the J. H. Gunn school. Transcript at 243–44 (Testimony of Phillip O. Berry).

*Sharon Elementary School.*—The new Sharon Road facility was situated in southeast Charlotte, in the predominantly white, Foxcroft residential area, just northwest of its former site. Transcript at 106 (Testimony of Dr. Wayne Church). The Sharon school serves grades K through 6. School Board Exhibit 6. The new facility incorporated the entire attendance area of the old elementary school facility plus a few additional blocks to the north to put the new building within its own attendance area. The local attendance area around the school is composed of an almost all white residential community. Transcript at 232 (Testimony of Dr. J. M. Robinson, Superintendent of the school system); *see* School Board Exhibit 20 (attendance lines). The black elementary school students assigned to Sharon come from the Boulevard Homes off of West Boulevard, a predominantly black community west of mid-city, approximately six or seven miles from the Sharon school. Transcript at 108 (Testimony of Dr. Wayne Church); School Board Exhibit 20. At the time the School Board decided to locate the Sharon school in Foxcroft, it knew that inner city blacks would have to be transported to the school. Transcript at 243 (Testimony of Phillip O. Berry).

*Northeast Junior High School.*—The Northeast Junior High School was moved about one and one-half miles south to its present site about three years ago. It is located on the same tract as Independence High School, in the extreme eastern portion of the county. Transcript at 109; School Board Exhibit 20. Although the record is

not clear, it appears that Northeast received its students, black and white, from the eastern portion of the county. *See* Transcript at 110 (Testimony of Dr. Wayne Church); 153–53 (Testimony of Patricia M. Lowe, School Board member); School Board Exhibit 3, at 19.

*Wilmore Elementary School.*—The formerly white Wilmore Elementary School is located in a now predominantly black community in the inner city. Its physical plant is relatively new. Wilmore has not been paired with any other school since 1974, and over the past three or four years has become predominantly black. The 1978 plan called for the closing of Wilmore School. Transcript at 167–68 (Testimony of Dr. Wayne Church). Wilmore has had an unstable attendance pattern since 1974. *See* School Board Exhibit 11, at 8; Transcript at 167, 169 (Testimony of Dr. Wayne Church), 203 (Testimony of Dr. J. M. Robinson). Despite the fact that Wilmore is located equidistant from both black and white population centers, the integration of the school was always problematical under the 1974 "feeder plan." Transcript at 203–04 (Testimony of Dr. J. M. Robinson). Although the Board considered pairing Wilmore with the new Sharon School, it never did so. *Id.*

The Board is currently considering its future need for new school buildings. At the time of the hearing the Board had not instructed its staff to try and find school locations "that would enable it to more easily desegregate those schools." Transcript at 138 (Testimony of Patricia M. Lowe). Superintendent J. M. Robinson testified that he had recommended that the staff consider placing new elementary schools along Highway 51, which runs through the predominantly white, far southeast portion of the county, far from most black homes. See Transcript at 206, 207; School Board Exhibit 20. He also expressed the opinion that the staff survey will show a need for future elementary school sites running from Derita (north and slightly east of the inner city) along a line southeast to Hickory Grove (east of the inner city). These schools, *if in fact built,* would be located nearer to the county's northern centers of black, school age population. There is no indication or record that re-opening or building of elementary schools (or any other schools) is being planned for the inner city, or for the western or northwestern portions of the district. *See* Transcript at 206; School Board Exhibit 20.

The portion of the 1974 desegregation plan (together with earlier, applicable orders) relating to the placement of public school facilities has not been fully implemented. Plaintiffs have not shown any probability of demonstrating implementation after further proceedings. That portion of the plan, together with the court's applicable orders, is interrelated with and is not separable from other major components of the pupil assignment features of the desegregation efforts of the court, the School Board, and the citizens of Mecklenburg County. The location of schools plays a large if not determinative role in (1) assigning the burden of attending non-neighborhood schools to various segments of the community, (2) making various grades available in various areas of the community, ·and (3) insuring that any given assignment and feeder plan will provide meaningful desegregation, rather just the predictably short lived *appearance* of desegregation.

In short, the construction, location and closing of schools have continued to make desegregation more difficult.

## B. PLACEMENT OF KINDERGARTEN AND ELEMENTARY SCHOOL GRADES REMAINS DISCRIMINATORY AND UNFAIR TO THE SMALLEST BLACK CHILDREN.

The School Board's limited plan for 1969–70 included the closing of seven predominantly black, inner-city schools, including five elementary schools. The reassignment of elementary school pupils under the 1970 plan required "transporting *black* students from grades *one through four* to the outlying white schools; and . . . transporting *white* students from the *fifth and sixth* grades from the outlying white

schools to the inner-city black schools." *Swann* order of March 21, 1970 (Supplemental Findings of Fact), at ¶¶ 32, 33.

The earliest remedial plans, therefore, had the effect of decreasing the elementary school classroom space in the inner city and putting the burden of desegregating the grades serving the youngest students almost entirely on the black children.

On August 3, 1970, the court, finding that not all reasonable efforts to achieve desegregation had been utilized, again suggested "restructuring" grade distribution among the schools as an available method. 318 F.Supp. 786, 799.

The mid-1971 proposal submitted by the School Board, which included the closing of Northwest Junior High and Double Oaks Elementary, also proposed the abandonment of predominantly black elementary school facilities. The enrollment at 15 elementary schools was to be cut roughly in half; nine of those schools were to lose their fifth grades and continue to serve only grade six. Younger students at these predominantly black schools would be reassigned and transported to outlying, predominantly white elementary schools. The plan, which was withdrawn by the Board during the hearing on its merits, was "discriminatory in detail and in overall result; [it] placed increased burdens upon black patrons while partially relieving white patrons of similar burdens; and [it was] reasonably susceptible of the interpretation that [it was] the first long step in the liquidation of the inner-city 'black' schools." *Swann* order of June 29, 1971; 328 F.Supp. 1346, 1347.

Two years later, on June 19, 1973, those failings of the early plans which resulted in the elimination of neighborhood classroom facilities for the youngest black students in the system had not abated. The black elementary school children in grades kindergarten through four were still getting "the most and the longest bus rides in the county," and virtually all the youngest black students in the system were being transported to distant schools. 362 F.Supp. 1223, 1230, 1232.

The joint proposal submitted by the School Board and CAG in July 1974 recognized the skewed distribution of grades throughout the elementary schools, and the need for improvement:

" . . . There has been an *effort* toward selection of specific major deviations from the feeder-school concept, where such would aid in providing equalization of transportation burden, *and toward the allocation of grades to schools on a basis that would give schools of each grade-level organization to all areas of the city and county.*"

School Board Exhibit 3, Introduction (emphasis added).

The proposal, approved by the court, established the "basis guideline" that

" . . . schools serving primary grades (including the voluntary-attendance kindergartens) are to be located *in every section of the system.* . . . In the future, the creation of any school serving fifth and sixth grades only is to be avoided; *in the next new pairings, the primary grades are to be located in a black residential area.*"

*Id.*, Basic Guidelines for this Proposal, at 3 (emphasis added).

Not only the court but also those involved in the formulation of the 1974 joint proposal (including School Board members), those responsible for administering the pupil assignment plan between 1975 and 1978, and those responsible for formulating the 1978 pupil assignment plan now challenged, all understood that the 1974 plan contemplated the use of formerly black and inner-city school facilities to house grades K through 3. *See, e.g.*, Affidavit of Margaret Ray (Former Chairman of CAG) (1974 proposal called for reassignment, where feasible, of grades 1 through 3 to formerly black schools); Transcript at 237–40 (Testimony of Phillip O. Berry, member of School Board since 1972) (Absence of any lower elementary school grades in the inner city was seen by the Board as an inequity in the 1974 plan, contributing to its instability and requiring remedial action on review). The

1974 plan itself called for the use of the Lakeview and Villa Heights Elementary School facilities for grades K through 2. Transcript at 144–45 (Testimony of Dr. Wayne Church); School Board Exhibit 3, at 16, 18. Lakeview and Villa Heights had been white elementary schools until 1970 or 1971; they had become predominantly black elementary schools by the time the 1974 plan was composed and implemented. Transcript at 114–16 (Testimony of Dr. Wayne Church); Transcript at 184–85 (testimony of Elizabeth Randolph, Associate Superintendent of Schools). Billingsville, historically a predominantly black K through 6 elementary school, a black island in a white community, continued to house grades K through 6 under the plan. *Id.*

After 1974, the School Board made two major changes in the location of elementary school grades. First, several fourth grades from outlying elementary schools were moved to elementary schools in the inner city which housed grades 5 and 6. Transcript at 146–47 (Testimony of Dr. Wayne Church); *see* School Board Exhibit 6. Second, the Board completed to its satisfaction the introduction of kindergarten grades into school facilities housing primary grades (grades 1 through 3). Transcript at 147–48 (Testimony of Dr. Wayne Church), 177–78 (Testimony of Elizabeth Randolph).

Since the 1974 decision to maintain Billingsville as a K through 6 school and to house grades K through 2 at Lakeview and Villa Heights, only one minor change has been made to increase the use of inner-city schools for the lower elementary school grades. In the 1978 plan, Lakeview was made K through 3 instead of K through 2. School Board Exhibit 13, at "Proposed Change V." The School Board has taken no action since 1974, save for the change at Lakeview, to provide increased primary grade service to the black community. *See, e.g.,* Transcript at 115 (Testimony of Dr. Wayne Church) (Since 1974 the School Board has not rearranged the grade structure in any formerly black school to serve grades K through 4) 177–78 (Testimony of Elizabeth Randolph) (School Board never instructed staff to design a primary grade

program for a formerly black school); 200–02 (Testimony of Dr. J. M. Robinson) (Reversing grades in the inner-city schools was discussed as a possibility in drawing the 1978 plan, but rejected in favor of reassigning fewer students).

One member of the School Board testified that, in her opinion, the reason lower elementary school grades were not reallocated to the inner-city schools was that if such a change were made "the whites would have not attended, let their children attend." Transcript at 137 (Testimony of Patricia M. Lowe).

The promise of the 1974 plan to bring the lower grades into formerly black schools has not been fulfilled. The School Board has decided that kindergarten classes should be placed in an elementary school if and only if the facility also houses the lower elementary school grades. Transcript at 177–78 (Testimony of Elizabeth Randolph). As noted earlier, however, with few exceptions, the formerly black elementary schools continue to house only the *upper* elementary school grades.

The portion of the 1974 desegregation plan (together with earlier, applicable orders) relating to the placement of kindergarten and elementary school grades throughout the Charlotte-Mecklenburg school system has not been fully implemented. Plaintiffs have not shown any probability of demonstrating implementation after further proceedings. That portion of the plan is interrelated with and not separable from other major components of the desegregation effort. The location of elementary and kindergarten classes throughout the system ultimately depends on the availability of physical facilities at any actual or proposed site. Furthermore, site selection for classes determines who is to bear the burden of leaving the neighborhood and how much of a burden that is to be upon any given individual or identifiable group of individuals.

In short, placement of elementary school grades and kindergartens remains grossly unfair to the smallest black children.

## C. FAILURE TO MONITOR THE THOUSANDS OF PUPIL TRANSFERS THAT TAKE PLACE EACH YEAR, IN THE CONTEXT OF THE "FEEDER" PLAN AND IN A COMMUNITY OF LONG STANDING HOUSING SEGREGATION, TENDS TO PROMOTE SEGREGATION IN THE SCHOOLS.

This court's first substantive order in *Swann*, April 23, 1969, found as a fact that:

"The system of assigning pupils by 'neighborhoods,' with 'freedom of choice' for both pupils and faculty, superimposed on an urban population pattern where Negro residents have become concentrated almost entirely in one quadrant of a city of 270,000, is racially discriminatory."

300 F.Supp. 1358, 1360.

On June 21, 1969, the court ruled that though "freedom of choice" transfers were not *per se* unconstitutional, they *were* subordinate to the constitutional mandate to desegregate. 300 F.Supp. 1381, 1384. In November of that year the court instructed the Board that, based on the past operation of the transfer plan in this school system (no white student ever having elected to attend a predominantly black school), unregulated transfers were not likely to be consistent with constitutional requirements. 306 F.Supp. 1299, 1304.

In February 1970 the court noted the failure by that time of school officials and outside consultants to reach an adequate solution, and called for several specific steps to be taken immediately. Among them (as modified by a later order) was a requirement that the Board adopt an active rather than continue a passive attitude toward transfer:

"That the defendants maintain a continuing control over the race of children in each school, just as was done for many decades before *Brown v. Board of Education,* and maintain the racial make-up of each school (including any new and any re-opened schools) to prevent any school from becoming racially identifiable.

"That 'freedom of choice' or 'freedom of transfer' may not be allowed by the Board if the cumulative effect of any given transfer or group of transfers is to increase substantially the degree of segregation in the school from which the transfer is requested or in the school to which the transfer is desired.

"That the Board retain its statutory power and duty to make assignments of pupils for administrative reasons, with or without requests from parents. Administrative transfers shall not be made if the [cumulative] result of such transfers, is to restore or [substantially] increase the degree of segregation in either the transferor or the transferee school."

311 F.Supp. 265, 268–69, *modified in part by* 318 F.Supp. 786, 801.

A modified "feeder" plan was adopted in 1970, with the court's reluctant approval, in substitution for the "Finger" plan earlier approved by this court and the United States Supreme Court. Over a year later, on October 21, 1971, the court found as fact that, in stark noncompliance with the court's earlier orders, virtually no safeguards had been established to monitor or control the resegregative effect of unlimited student transfers:

" . . . There is, according to the evidence, no board policy even to consider race in pupil transfers unless a particular transfer or enrollment will result in making a school more than 50% black. (What they would do even in that event is not clear.) There is no policy to restrict transfers which have the cumulative effect of substantially increasing segregation; no policy to learn what children move from one attendance zone to another during the summer, and to take these inevitable changes of residence into account in planning fall pupil assignments; no central method of keeping track of changes of residence during the school year; and no policy to check on 'changes of residence' to determine whether such changes are *bona fide* or not. There is also no admitted *practice* of doing any of these things to comply with the orders of court (although it might be inferred from the current statistics that, without admitting to a policy,

the staff are being allowed or expected in fact to keep all schools less than 50% black).

\* \* \* \* \* \*

"The word 'substantially' was put into the order to allow the board leeway for use of discretion and common sense, but not to authorize abandonment of control until a school has already become predominantly black.

"Racial discrimination through official action has not ended in this school system.

"*Racial discrimination through official action has not ended when a school board, knowingly adopts a plan likely to cause a return to segregated schools and then refuses to guard against such re-segregation.*"

334 F.Supp. at 629 (emphasis added).

On June 19, 1973, the court found that unrestricted transfers continued to plague desegregation efforts, particularly at schools such as West Charlotte High School, where the black student population was maintained at just below 50% of the "*projected*" student body; such "projections" were chronically inaccurate for their failure, in part, to anticipate the effect of a lax transfer policy. 362 F.Supp. 1223, 1233–34.

The joint Citizens Advisory Group—Board proposal approved in 1974 implicitly recognized the fact that the Charlotte-Mecklenburg school system could not be desegregated in the absence of a coherent transfer policy; its *first* "Basic Guideline" was:

"I. *Transfer policy and procedure.* Explicit policies and procedures for the management of future reassignments of pupils, either in the interest of the school system or on request of pupils, need formulation and adoption. Such policies are to fulfill the purpose of maintaining an integrated school system with a stabilized assignment program."

School Board Exhibit 3, at 2.

Pending further implementation of the guideline, the proposal established interim safeguards providing, *inter alia,* that each individual transfer request was to be evaluated by the Board in light of its effect on the racial composition at both the sending and the receiving school, and was to be justified by a change in residence or other *bona fide* reason for transfer. The assignment pattern resulting from the implementation of these guidelines, was, under the terms of the 1974 plan, to be reviewed in three years. *See id.* at 5–6.

In March 1975 the School Board submitted a report on compliance. That report contained a proposal to define further the control over inter-school transfers to be exercised by the Board and administrative staff for the purpose of preventing those transfers from interfering with the fairness, stability, and general success of the desegregation effort. The plan set numerical benchmarks against which to measure the effect of any proposed, individual transfer. *See* School Board Exhibit 5, at II–6 to II–7.

Students frequently change schools. For example, during school year 1975–76, the Board processed transfer requests equaling 25.8% of the elementary students, 20.7% of the junior high students, and 20.2% of the senior high students. Transcript at 84 (Testimony of Dr. Wayne Church); School Board Exhibit 11. During 1977–78, for elementary schools alone, admissions and withdrawals totaled over 10,600! Board Exhibit 17. Nationwide, census figures show one-fifth or more of the families move every year. 334 F.Supp. 626.

Despite the continuing and substantial number of transfer requests, the record shows an absence of any coherent, sustained effort (a) to monitor student flow resulting from pupil reassignment, (b) to evaluate the impact of reassignment on desegregation efforts, and (c) to provide such information to the School Board at a meaningful time— that is, *before* the Board's decision is made on *individual* reassignment requests. When a transfer request is made, the administrative staff investigates the request and makes a recommendation. The staff does

not take principally into consideration the impact of the requested transfer on segregation. The staff *may* be aware of such impact, "but the *intensity of the request determines* action toward it." Transcript at 155–56 (Testimony of Dr. Wayne Church) (emphasis added). If the staff recommends a transfer, that recommendation is sent on to the School Board for its approval. The form on which that recommendation is sent does not have a blank calling for any indication of the impact of the transfer on the racial composition of the sending or receiving school; no formal recommendation is made by the staff regarding any particular, proposed transfer's impact on racial composition. Transcript at 164–66 (Testimony of Dr. Wayne Church). Informal recommendations are made from time to time on individual applications for transfer, but only, apparently, when both the staff and School Board have denied the request, the student has appealed, and the matter has come on for hearing before the Board. Transcript at 156–57 (Testimony of Dr. Wayne Church).

The only data on racial composition compiled at regular intervals and presented to the Board are the monthly reports on attendance and racial composition at the various schools in the system (School Board Exhibit 6). Those compilations would be useful to Board members who happened to have before them, at a meaningful time, enough of the past monthly reports to determine whether there was any observable trend at the relevant schools. The reports, however, just show the gross changes in school population, changes which result from several factors *in addition to* School Board reassignment policies and practices.

A study was submitted by the staff to the School Board in May 1977. *See* School Board Exhibit 11. That study sets out, for the first time, the *changes* in the racial compositions of the system's schools—in this case for the four years preceding the 1977–78 school year. Like the monthly reports, it did not isolate any data, or include any analysis, relating exclusively to the impact of intra-system transfer policies on racial composition. At best, that study would appear to be designed to assist the Board in meeting its commitment to *review* the impact of transfer practices three years after the 1974 implementation. It could not have been part of the required, continuous *monitoring* of the impact of intra-system transfers.

At the time of the hearing, the staff was in the process of conducting a study on the impact of reassignment practices on racial composition. Transcript at 231 (Testimony of Dr. Wayne Church). The only written evidence supplied by the Board which *does* provide apparently self-explanatory though isolated data on the impact of reassignment practices is Exhibit 18, prepared the day before the hearing. Transcript at 120 (Testimony of Dr. Wayne Church).

Phillip O. Berry testified that the Board was always "very aware" of the impact of reassignments on racial composition in the schools, explaining:

"We had policies which involved requests, minority to majority transfers and other things, and the staff made us aware that *they* were operating *on guidelines as well as residential transfers. The majority of transfer requests which were granted was based upon residential patterns* . . . . ."

Transcript at 244–45 (emphasis added). As noted earlier, the transfer policies as approved by the court in 1974 and as amended in 1975 specifically require that even transfer requests resulting from claimed residence changes be considered *prior to approval* in light of their impact on racial composition.

That portion of the 1974 desegregation plan (together with earlier, applicable orders) relating to the monitoring and control of pupil transfers has not been fully implemented. Plaintiffs have not shown any probability of demonstrating otherwise in further proceedings. This portion of the plan is interrelated with all other identified components of the pupil assignment features of the desegregation plan because, simply put, the resegregative tendency of an unrestricted or unmonitored transfer

policy or practice can, history teaches, undo much of what the community has struggled to accomplish. The location of buildings and the placement of classes within those buildings can have little positive, lasting impact, unless the flow of students among various facilities is controlled.

In short, in this essentially segregated community, and under the "feeder" plan, the Board's continued failure to monitor and control the many thousands of yearly pupil transfers tends to promote and permit re-segregation. In default of such continuing controls, periodic large scale reassignments like those made in 1978 will continue to be necessary.

### D. DISCRIMINATORY BURDENS OF DESEGREGATION REMAIN UPON THE BLACK CHILDREN.

The partial desegregation plan, submitted in amended form by the School Board in July 1969 for the 1969–70 school year, contained, for the first time, a formal acknowledgment of the Board's affirmative duty to desegregate the school system. However, that plan put almost the entire burden of desegregation on the black community:

". . . The Board plan proposes to close Second Ward High School, Irwin Avenue Junior High School and five inner-city elementary schools (five of which were already marked for abandonment) and to reassign their 3,000 students to outlying white schools. This part of the plan has struck fire from black community leaders and some other critics. Counsel for the plaintiffs contend that it puts an unconstitutional and discriminatory burden upon the black community with no corresponding discomfort to whites. One spokesman for a large group of dissenting and demonstrating black citizens was allowed to express his views at the August 5, 1969 hearing. Threats of boycotts and strikes have been publicized.

"This part of the plan is distasteful, because all but 200 of the students being reassigned *en masse* are black. It can legitimately be said and has been eloquently said that this plan is an affront to the dignity and pride of the black

citizens. Pride and dignity are important. If pride and dignity were all that are involved, this part of the plan ought to be disapproved."

306 F.Supp. 1291, 1296 (August 15, 1969). The court approved the plan on an interim basis because, ostensibly, it offered a desegregated school year to some 4,200 black students, but stated that "It is not the intention of this court to endorse or approve any future plan which puts the burden of desegregation primarily upon one race." 306 F.Supp. at 1298.

On November 7, 1969, the court found that the School Board had failed to implement the plan as approved in August; that they had allowed black students who were to be transferred to white schools to attend black schools closer to home; that the results were meager in terms of actual desegregation; and that at the most, not over 1,315 of the 4,245 promised transferees had ended up in white schools. 306 F.Supp. at 1302.

More such official discrimination surfaced in 1971 in the plan proposed by the School Board in substitution for the Finger plan earlier adopted by the court. That plan, explained in some detail earlier, was disapproved on June 22, 1971, in part because it sought to abandon the inner-city "black" schools. The plan was found to be regressive and unstable, and to put the burden of desegregation on the black community, requiring some of the youngest black elementary school children to travel over twelve miles while no corresponding duty was placed on white students. School officials were reminded that a desegregation plan placing substantially unequal burdens on different races in the community was just as much official action unlawful under the Constitution as had been the earlier, official acts of discrimination which necessitated the desegregation plan in the first instance. *See Swann* order of June 22, 1971, at 1–6. *See also* 328 F.Supp. 1346 (June 29, 1971).

Two years later, on June 19, 1973, after allowing the School Board opportunity during the 1971–72 and 1972–73 school years to make appropriate adjustments in prior

plans, the court reviewed the proposals for the 1973–74 school year and found many of the same problems addressed by the court four years earlier. Principal among them was the continuing placement of the heaviest burden of desegregation on black students in terms of (1) the number and percentage of black students sent to outlying areas compared with the number and percentage of white students sent to the inner city and near northwest areas; (2) the imposition of the greatest burden on the youngest black students in the system; and (3) the number of years black students would be required under the plan to travel to non-neighborhood schools in comparison with their white counterparts. The court found these effects to be "signs of continuing discrimination" and required, as an interim remedy, that the School Board repopulate some of the under-capacity, inner city schools with students from outlying schools having the lowest proportion of black students. 362 F.Supp. 1223, 1232–38.

The joint CAG–Board proposal approved by the court in 1974 recognized that equalization of the burdens of desegregation was instrumental to any realistic plan: "In arriving at the present proposal, mutual efforts have been made to establish fairness in the county-wide distribution of the burdens of long or long-term transportation to and from distant schools. There has been an effort toward selection of specific major deviations from the feeder-school concept, where such would aid in providing equalization of transportation burden . . . ." School Board Exhibit 3, Introduction. In line with this guiding principle, the plan called for several specific changes:

"The elementary school areas assigned to West Charlotte in both the Board and CAG plans are to form the base assignment area for that school. Other areas assigned to West Charlotte are to be selected so as to *equalize the out-busing burden* and provide a *stability-capable* enrollment for that school.

\*　　\*　　\*　　\*　　\*　　\*

"As many long-distance satellite arrangements as possible are to be eliminat-ed. When necessary, a deviation from the feeder arrangement is to be made by assigning a satellite to a closer school for at least one school level of grades.

\*　　\*　　\*　　\*　　\*　　\*

"No children in a satellite or in any other area close to a school are to be so assigned that they are transported away from their home area for the full 12 years of school. Out-bussing assignments are to be distributed as equally as is possible and practical.

\*　　\*　　\*　　\*　　\*　　\*

"Where practical immediately, and where not, in the near future, *schools serving primary grades* (including the voluntary-attendance kindergartens) are to be located *in every section of the system*. In schools now paired, when possible the *fourth grade is to be moved* from the primary school to the fifth and sixth grades school. In the future, the creation of any school serving *fifth and sixth grades* only is to be avoided; *in the* next *new pairings, the primary grades are to be located in a black residential area*. As kindergartens are phased in, priority is to be given, within the restraints of regulations, to the placing kindergartens in the schools on the west side of the county."

*See id.* at 2, 3 (emphasis added).

Except for black children living near and attending Lakeview (formerly white), Villa Heights (formerly white), and Billingsville (a formerly black school surrounded by a white community), black elementary children bear the major burden of travel to outlying schools in predominantly white neighborhoods. The inner city elementary schools continue to house primarily the *upper* elementary school grades. Wilmore Elementary School, in the inner city, has been closed under the 1978–79 assignment plan. No new elementary school facilities appear to be planned for the center city; rather, the record suggests that facilities are generally to follow the outward migration of new housing, away from the center city.

*Discriminatory burdens cannot be reduced if school facilities and classes contin-*

*ue to be located at sites which by their very location make such reduction impossible.*

That portion of the 1974 desegregation plan, together with earlier, applicable orders, relating to equalizing the burdens of desegregation among races has not been fully implemented. Plaintiffs have not shown any probability of demonstrating such implementation after further proceedings. Establishment of a fair plan is interrelated with and not separable from other features of the pupil assignment portion of the desegregation effort.

Neither is it separable from the constitutional mandate to desegregate the schools. *See, e. g., Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, 241, 93 S.Ct. 2686, 37 L.Ed.2d 548 (Powell, J., concurring in part and dissenting in part); *NAACP v. Lansing Bd. of Education*, 559 F.2d 1042 (6th Cir.), *cert. denied*, 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977).

In short, black children and their families continue to bear discriminatory burdens of desegregation.

## V.

### THE 1978 PUPIL ASSIGNMENT PLAN IS A VALID EXERCISE OF THE SCHOOL BOARD'S AUTHORITY.

#### A. THERE HAS BEEN NO PRIOR COMPLETE IMPLEMENTATION OF A JUDICIAL REMEDY RELATING TO PUPIL ASSIGNMENT.

The record, summarized in this order, wholly fails to support a finding, or the promise of one, on the first essential element of a claim under the *Pasadena* decision—prior, complete implementation of a judicial remedy relating to a separable component of school administration—here, pupil assignment. The facts are to the contrary. "Racially neutral attendance patterns" have never been achieved.

#### B. THE CONTINUING PROBLEMS DEALT WITH BY THE 1978 PLAN ARE WITHIN THE SUBSTANTIAL, IF NOT THE EXCLUSIVE, CONTROL OF THE SCHOOL BOARD.

The record does not support an interim finding, or the reasonable promise of a final finding, that the continuing problems regarding the location of facilities, the placement of elementary school grades, and the general equalization of the burdens of desegregation, are due exclusively to actions of others or circumstances or occurrences beyond the control of the School Board. The facts are otherwise. These matters are and have been within the substantial if not exclusive control of the School Board.

#### C. THE 1974 PLAN AND THE ORDER APPROVING IT SPECIFICALLY CONTEMPLATED THE LATER APPRAISAL AND THE MODIFICATIONS WHICH WERE MADE IN 1978.

The holding in *Pasadena* is by its own terms inapplicable to desegregation mandates that "call for . . . 'step at a time' plans by definition incomplete at inception." It is also inapplicable to "a plan embodying specific revisions of the attendance zones for particular schools, as well as provisions for later appraisal of whether such discrete individual modifications had achieved the 'unitary system' required by *Brown v. Board of Education*." *Pasadena, supra* 427 U.S. at 435, 96 S.Ct. at 2704.

The overwhelming weight of the record shows that the 1974 plan was composed of specific provisions known at the time to require reevaluation and, quite possibly, modification, before meaningful desegregation might be achieved, and that *the court, the draftsmen of the plan, and the officials responsible for its execution, so understood it.* The 1978 plan challenged by plaintiffs is the implementation (one year late) of the 1974 commitment to reevaluate, after three years, the specific provisions of the 1974 plan.

The 1974 plan included several broad statements of policy and guidelines to be adopted by the School Board on an interim basis in order to implement those policies. These have in large measure been outlined elsewhere in this order. That plan also contained extensive, specific revisions to the then existing pupil assignment pattern. *See* School Board Exhibit 3, at 8–14. The

assignments were embodied in a plan breaking down attendance patterns by school and grade. *See id.* at 15–22.

*The plan, by its terms, acknowledged the need for a later revision of those specific pupil assignments in order to comply with the constitutional mandate of a complete and fair desegregation plan:*

"The Board of Education shall review its pupil assignment program each third year, at which times changes may be effected to maintain full utilization of school capacities at appropriate levels of integration."

*Id.* at 6.

As noted earlier, the court approved the 1974 plan in its order filed July 30, 1974, upon the express condition that *all* the guidelines and policies stated in the plan be followed and implemented. The court stated at the time that "sizeable continuing problems" remained.

One year later the court removed the *Swann* case from the active docket and ordered the file closed, without relinquishing jurisdiction. The court again noted the problems remaining from past active discrimination, but closed the file to provide the School Board, which appeared to be aggressively attacking the problems, the maximum leeway within the confines of all orders of continuing effect (including the provisions of the 1974 plan).

The draftsmen of the 1974 plan were aware of its essentially incomplete character and the need for further modifications to promote full implementation of the policies and guidelines established in the plan. Ms. Margaret W. Ray, Chairman of the CAG at the time it participated with the Board of Education in formulating the 1974 plan, stated in her affidavit:

". . . An important feature of the Joint Proposal, as well as the earlier proposals of CAG, was that within three (3) years the Board would revise the pupil assignment plan in order to insure the elimination of the remaining vestiges of discrimination and the continuation of fairness and stability. CAG and the Board knew that there were certain schools in the community which would probably not be stabilized under the joint proposal, and that there would be shifting population, the location of new schools and the necessity for some revisions to insure the best utilization of the schools. CAG wanted to avoid the necessity for annual revisions of the plan which had taken place during the period 1970–74."

Affidavit of Margaret W. Ray, at 3 (filed September 15, 1978); *accord,* Affidavit of Betsy Bennett (filed September 15, 1978).

The Board of Education was equally aware of the shortcomings of the 1974 plan and the need for review. Chairman Phillip O. Berry testified that at the time the plan was being approved, substantial population shifts were occurring in parts of the county. In addition, the Board heard frequent complaints that the plan did not impose equal burdens on all segments of the community. Transcript at 238–40. *See also* Transcript at 95 (Testimony of Dr. Wayne Church) (1978 plan was the implementation of the 1974 plan's provision for review); Transcript at 132–36 (Testimony of Patricia M. Lowe) (1978 plan designed to improve utilization of inner city schools and equalize the burdens of desegregation [part of the Board's commitment under the 1974 plan]).

The 1978–79 plan consists principally of thirteen specific alterations in the pupil attendance patterns established by the 1974 plan. *See* School Board Exhibit 13. They were, in part, the result of the court approved "later appraisal" of the 1974 plan.

The court, in its discretion, left the duty of "later appraisal" with the Board and did not mandate that the Board file a report on the results of that appraisal. The court quite clearly, however, retained jurisdiction and noted that it would consider future motions for further relief premised on any failure of the Board to abide by the commitments made in the 1974 plan.

This approach reflected the proper division of duties between court and school authority in such cases. *See, e. g., Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968):

"The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. *It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress* toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief. Of course, the availability to the board of other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method. *Moreover, whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed.*"

*Id.* at 439, 88 S.Ct. at 1695 (emphasis added); *accord, Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. at 21, 91 S.Ct. 1267.

## D. THE 1978 PLAN AND CHANGES IN PUPIL ASSIGNMENT ARE ALSO BASED UPON AN INDEPENDENT COMMITMENT OF THE SCHOOL BOARD AS A MATTER OF PUBLIC POLICY TO MAINTAIN A DESEGREGATED SCHOOL SYSTEM WITHOUT REGARD TO COURT INTERVENTION.

*Independent* of any court order "[the] Board of Education acted *voluntarily* [in designing the 1978–79 pupil assignment plan] in accordance with its authority to operate the school system; .. . . if this Board of Education chose to run an integrated school system on the basis of preconceived ratios, it has that constitutional right. Like the plaintiffs in this case, the defendant relies upon the principles, plural, in the *Swann* case." Transcript at 16 (Opening Statement of Mr. William Sturgis, attorney for defendant School Board) (emphasis added). Counsel's statement is supported by the evidence.

In September 1977 Superintendent Robinson met with the School Board to discuss the upcoming pupil assignment revisions. At that meeting he proposed some additional guidelines to be considered in drafting the revisions. The last sentence of the final guideline presented, in its form as adopted by the Board, stated:

"The main goal of the Charlotte-Mecklenburg Schools is to have quality education for all students in the system."

School Board Exhibit 12.

When the staff of the school system presented the revised plan to the School Board in late 1977, it accompanied its presentation with a memorandum from Dr. Robinson, which characterized the (then) proposed plan as follows:

"It follows the guidelines adopted by the Board *and* carries out the Board's commitment to an integrated school system and to a quality educational program for all students."

Added Defendants' Exhibit 6 (emphasis added) (Memorandum dated November 28, 1977).

The Board's independent commitment to the maintenance of a desegregated school system as a component of its commitment to provide a quality educational experience for its constituents was clearly restated by Patricia M. Lowe and Phillip O. Berry, both members of the School Board when the 1978–79 plan was considered. *See* Transcript at 132, 245, 248–49.

A clear statement of the impact the School Board's commitment to a desegregated school system had on the formulation

of the 1978–79 pupil assignment plan can be found in a colloquy between Superintendent Robinson and counsel for defendant School Board:

"Q. Is it fair to say that an integrated school system was a #1 priority and to the, and was restrained only by the 50 percent requirement?

"A. That's right as far as I'm personally concerned, and the Board was on record on several occasions of being committed to operating an integrated school system.

"Q. And you say you were personally concerned, and is this true with the staff, also?

"A. To the best of my knowledge and the best that I could interpret from working with the members of the staff, there was a similar commitment with the staff members I worked with.

"Q. In formulating the '78 plan, you were committed to making those moves to attain an integrated school system. Is that correct?

"A. That's correct.

"Q. And the only changes that you would have made in your recommendation to achieve that goal, absent the 50 percent Court order, would be to allow one or two schools to go to 52 percent?

"A. I would like to have had more flexibility than the 50 percent in some instances, but I would be opposed to recommending any plan that went, any of the schools going over more than a few percentage points above 50 percent."

Transcript at 226–27.

E. RACE IS ONLY ONE OF SEVERAL SIGNIFICANT FACTORS CONSIDERED BY THE BOARD AND STAFF IN PUPIL ASSIGNMENT.

Several factors were considered in making the 1978 pupil assignments. At the September 1977 meeting between Dr. Robinson and the School Board to discuss the upcoming work on the pupil assignment plan, Dr. Robinson set out the basic framework upon which the pupil assignment plan was to be built:

". . . Dr. Robinson reminded the Board that any solution to the pupil assignment plan that may be developed will be very limited in the amount of improvement it can bring to the school system because the problems involved are so interrelated that any attempt to solve one without addressing the others limits the possibility for a long-range solution. Dr. Robinson listed the following partial list of problems stating that the resolution of these problems will require carefully coordinated long-range planning:

"1. We are involved with a junior high school study that will probably recommend a feasibility study of a middle school plan for our school system.

"2. Our grade organization plan is fragmented by our pupil assignment plan.

"3. Our feeder areas are complicated and difficult to understand and coordinate.

"4. We are operating many small schools that are difficult to justify economically.

"5. Several of our schools have student bodies whose students are virtually all economically deprived.

"6. Our curriculum is restricted because of lack of planning between two or more feeder areas.

"7. A lack of coordination between the school system and other community planning agencies continues to generate unnecessary problems.

\* \* \* \* \* \*

"Dr. Robinson presented the following additional pupil assignment guidelines for the Board's consideration:

"1. *Drawing of attendance lines.* To the extent possible attendance lines will be drawn along natural boundaries. Where obvious inequities exist within the present plan, an effort will be made to keep neighborhoods together in the assignment of students to a school.

"2. *Utilization of schools.* All schools will be utilized to the fullest extent possible. This is in keeping with the

commitment by the Board 'to maintain full utilization of school capacities at appropriate ratios of racial integration' (Joint Proposal—July 1974, Specific Proposals, Item C).

"3. *Assignment of children in integrated neighborhoods to the same school.* Children in an integrated neighborhood will be assigned to the same school when there is not a conflict with existing guidelines. Where integrated neighborhoods exist, an effort will be made to maintain walk-in schools."

School Board Exhibit 12.

In Dr. Robinson's November 1977 memorandum to the School Board accompanying the proposed revisions, he reiterated that "The aim of the staff was to accomplish needed changes—those related to (1) high or low ratio schools, (2) capacity, (3) neighborhood or safety needs, etc.—using a fairness-stability approach for the least change of students to do the job hopefully for three years or more." School Board Exhibit 10, at 4.

Both Dr. Robinson and Dr. Church reaffirmed at the hearing in this action that (a) few, if any, of the specific modifications adopted could be attributed exclusively to considerations of racial proportions in the individual schools, and (b) many changes would have been required irrespective of considerations of race. *See, e. g.,* Transcript at 193–94 (Testimony of Dr. Robinson) (considerations of capacity, maximization of neighborhood schools, pupil safety), 201, 215 (racial proportion carried the highest priority in general but was not always the determinant; stability and fairness were overriding concerns of the School Board and the public), 217–18 ("There are a combination of reasons involved in this assignment. It would have been very easy to make a reassignment plan based only on ratio. . . . We took six months developing this plan trying to get more children nearer home, trying to better utilize the capacity of schools and trying to put the children in a safer situation; otherwise, it would be very simple just to follow ratios.

That's just moving numbers around."), 196 (irrespective of race, movement in the community would have necessitated a revised pupil assignment plan in 1978); Transcript at 126 (Testimony of Dr. Church) (because of the overcrowded conditions in some of the schools that existed prior to the adoption of the 1978 plan, the *changes made for capacity reasons are not separable from the changes made for reasons of racial composition* ).

The 1978 plan, both in general terms and in its specific provisions, reflects this multi-faceted approach to pupil reassignment. *See, e. g.,* School Board Exhibit 13, at 3 n.; *accord,* Transcript at 61–62 (Testimony of Dr. Wayne Church), 136 (Testimony of Patricia M. Lowe). The explanations in the plan of the individual changes proposed confirms the testimony of every staff and Board member who had first hand knowledge about the proposal and its adoption—many factors, including racial composition, were brought to bear on pupil assignment decisions.

**F. THE BOARD HAD LAWFUL DISCRETION TO MAKE THE ASSIGNMENTS IT DID MAKE IN 1978.**

The United States Supreme Court, has clearly declared the legality of a decision by a School Board to implement a policy such as that adopted by defendant School Board:

"*School authorities* are traditionally charged with broad power to formulate and implement educational policy and *might well conclude, for example, that in order to prepare students to live in a pluralistic society* each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. *To do this as an educational policy is within the broad discretionary powers of school authorities* · · · ·"

402 U.S. at 16, 91 S.Ct. at 1276 (emphasis added); *accord, Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 242, 93 S.Ct. 2686, 2714, 37 L.Ed.2d 548 (1973) (Powell, J., concurring in part and dissenting in part):

"In a pluralistic society such as ours, it is essential that no racial minority feel demeaned or discriminated against and that students of all races learn to play, work, and cooperate with one another in their common pursuits and endeavors. *Nothing in this opinion is meant to discourage school boards from exceeding minimal constitutional standards in promoting the values of an integrated school experience* ") (emphasis added);

*Offermann v. Nitkowski,* 378 F.2d 22 (2d Cir. 1967); *Springfield School Committee v. Barksdale,* 348 F.2d 261 (1st Cir. 1965).

The School Board's demonstrated, independent commitment to the maintenance of a desegregated school system and the implementation of that commitment through the 1978 pupil assignment plan is the type of policy decision to consider race as a factor in making pupil assignments which was contemplated by the language in *Swann.*

The recent decision of the Supreme Court in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), is not to the contrary. Five of the nine Justices held that race may be taken into consideration as a factor in a program of admissions to a public educational institution. *See* 438 U.S. at 296 n. 36, 98 S.Ct. 2733 (Powell, J.), 325–26 (Brennan, White, Marshall, Blackmun, JJ.). These same five Justices concluded that the state's interest in assuring a diverse student body is substantial, and in some cases compelling. *See id.* at 311–15, 98 S.Ct. 2733 (Powell, J.), 362–63, 98 S.Ct. 2733 (Brennan, White Marshall, Blackmun, JJ.). Justices Marshall, Brennan, White and Blackmun cited with approval the language quoted above from *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. at 16, 91 S.Ct. 1267, 28 L.Ed.2d 554, *see Bakke,* 438 U.S. at 363, 98 S.Ct. 2733.

Moreover, there are several important distinctions between the School Board's 1978–79 pupil assignment plan and the admissions program of the University of California at Davis Medical School [U. C. Davis] challenged in *Bakke.* First, unlike the U. C. Davis program, considerations of race or ethnic status do not result in the disenfranchisement of any student in the system. All decisions of the School Board implemented by the 1978 pupil assignment plan relate only to *placement* of students at the various facilities within the system, not to their *right* to be placed *somewhere* in the system. *Cf.* 438 U.S. at 300 n. 39, 98 S.Ct. 2733 (Powell, J.). No one has "stood in the school house door" and barred plaintiffs from an equal educational opportunity. Second, considerations of racial composition were inextricably intertwined with non-racial considerations in devising the plan. Third, as previously shown in this order, and unlike *Bakke,* the 1978 plan devised by the Charlotte-Mecklenburg Board did not originate against a backdrop devoid of specific judicial findings or administrative acknowledgments of the prior segregated status of the school system. It did not originate in some untutored, spontaneous, and generalized view of the public welfare. The plan is a sign of the maturation, not the metamorphosis, of the school system and its administration.

The 1978–79 pupil assignment plan as approved by the School Board, in light of the history of this school system, is well within the constitutional authority of the School Board to implement in order to fulfill its independent commitment to the operation of a desegregated school system.

G. PLAINTIFFS HAVE SHOWN NO INJURIES JUSTIFYING RELIEF.

Plaintiffs have pleaded and appeared in their individual capacities. They do not represent a class. They have not sought to be certified as representatives of a class. Plaintiffs, appearing before the court to vindicate *personal* rights, bear the burden under applicable precedent of demonstrating *personal* injury or deprivation. They have shown none.

The individual pupil assignment decisions of the 1978–79 plan were the result of a complex analysis of several factors, only some of which related to racial composition. Many of the changes made would have been made irrespective of racial considerations, because of growth and other changes in the

community served by the school system. Under these circumstances, there is considerable doubt whether there is any causal relationship between considerations of racial composition and the elements of the 1978–79 plan which affect the named plaintiffs or their wards. *See Bakke, supra* at 320 n. 54, 98 S.Ct. 2733 (Powell, J.); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Plaintiffs have failed to make *any* showing that improper considerations of race played a substantial part in the formulation of the components of the 1978–79 plan affecting *them*; they have produced no evidence whatever of any injury or harm to them from the Board's actions; and there is no indication of record that they will fare better on that issue in any further proceedings.

That other persons might, hypothetically, be able to show that racial considerations played a substantial role in their reassignment under the 1978–79 plan, even if such considerations were unlawful, does not aid plaintiffs. They are the ones who instituted and shaped this litigation. They are not class representatives and are not entitled to assert the rights of others. *Cf. East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

## VI.

CONCLUSION: THE CONTINUING PROBLEMS THAT REMAIN SHOULD BE LEFT IN THE HANDS OF THE SCHOOL BOARD.

When desegregation of schools was first ordered in *Swann* in 1969, the principal physical obstacles were the racial segregation of housing in the community and the fact that schools were located in places convenient and intended to reflect that segregation in the schools. Those facts of life have not materially changed. Segregation of schools and housing in 1969 was the result of the organized law and financing of the state, with heavy financial help from the federal government. Any pupil assignment plan which insisted upon geography or residence or "neighborhood" as the basis of pupil assignment was bound to produce segregated schools.

The "Feeder Plan" of 1971 made things worse by taking a single school district (the city and county) and dividing it into ten administrative districts or "feeder areas" whose residents were presumptively required to attend school within their feeder areas. This plan concentrated black students into a few feeder areas, thereby adding considerably to the pressures for re-segregation and, as reported above, put over 7,500 more children on busses.

None of those circumstances has materially changed since 1969. As long as housing is segregated, schools will be segregated—unless assignments of pupils are made and locations of schools are determined so as to keep schools from being segregated. Since more than one-fifth of the children change schools every year, it is considerably easier and cheaper and more efficient to make appropriate pupil assignments than it is to move school buildings or houses.

All the school boards since 1969 have been cool to the idea of routinely controlling pupil transfers so as to prevent schools from becoming racially identifiable. (Circumstances strongly indicate that the staff are being *allowed* to do this without confessing it, but no formal instructions to the staff to do so have yet been given.) As long as there is no active routine policy to assign students and monitor transfers in aid of desegregation (when making decisions on individual requests for transfer), it will be necessary to do what the 1978 School Board did; that is, make periodic large scale adjustments which will prevent schools from becoming segregated again.

■ Within their self-imposed limits upon the monitoring of pupil transfers, the 1978 actions of the Board were a sound exercise in school administration and were within the authority and good judgment of the Board under the law.

Although the findings of fact on which this order is based amount to a determination that discrimination has not been ended,

no change in existing orders will be required. This order simply upholds the actions of the 1978 Board against the attacks by the plaintiffs, and leaves the continuing problems of segregation in the hands of the School Board where they belong.

It took three centuries to develop a slave culture, to fight a bloody civil war, and to live through the century of racial turmoil after that war. Although "separate but equal" is again a shibboleth apparently tempting to many high-placed people, it has not tempted the present School Board, who are standing fast in their endeavor to run the schools according to law while providing quality education. The achievement tests, now so big in educational news, show that substantial educational progress is being made in the local schools. The fact that many black students, though showing notable improvement, don't yet do so well on those tests as others of greater advantage and income is no argument for return to segregation. It has already been noted in the *Swann* case that:

> "The essence of the *Brown* decision is that segregation implies inferiority, reduces incentive, reduces morale, reduces opportunity for association and breadth of experience, and that the segregated education itself is inherently unequal. The tests which show the poor performance of segregated children are evidence showing one result of segregation. *Segregation would not become lawful, however, if all children scored equally on the tests.*"

318 F.Supp. 786, 794 (1970) (emphasis added).

The culture and attitudes and results of three centuries of segregation cannot be eliminated nor corrected in ten years. Human nature and practices don't change that fast, even in the hands of people of good will like the members of the present School Board. They need time to work their own experiments, and to find their own ways of producing the sustained operation of a system of schools in which racial discrimination will play no part. I vote to uphold their efforts to date, and to give them that time.

## VII.

## ORDER

Based on the foregoing, which contain this court's findings of fact and conclusions of law, and on a review of the record as a whole,

IT IS ORDERED, ADJUDGED AND DECREED:

1. That plaintiffs' prayer for a temporary restraining order and injunctive relief to prevent or enjoin the implementation by defendants of the 1978–79 pupil reassignment plan is denied.

2. That counsel shall advise the court within twenty (20) days of the filing date of this order whether they desire to present any further evidence. Unless good cause is shown for additional proceedings, the court will consider the hearing already held to be consolidated with the trial of the action and shall enter a final order and judgment consistent with this opinion. *See* Federal Rules of Civil Procedure rule 65(a)(2).